OPINION OF THE COURT
Bruce G. Dean, J.
On August 8, 1978, a Tompkins County Grand Jury returned an indictment against defendant, Bernadette Powell, charging her with the crime of murder in the second degree, in alleged violation of subdivision 1 of section 125.25 of the Penal Law. The specification alleged that on or about July 9, 1978, at about 8:00 a.m., at Room 253 of the Holiday Inn in the Village of Lansing, Tompkins County, New York, defendant, Bernadette Powell, with the intent to cause the death of Herman D. Smith, Jr., did cause the death of Herman D. Smith, Jr., by firing one shot into his heart with a .22 caliber revolver. The defendant, under this indictment, came on for trial before the undersigned on March 6, 1979, and on March 22, 1979, at 10 a.m., the jury returned a guilty verdict against defendant of murder in the second degree, as charged in the indictment, an A-l felony. On June 29, 1979, defendant was sentenced to an indeterminate term of imprisonment of not less than 15 years and not more than her natural life.
Defendant moved to set aside the verdict on the ground of newly discovered evidence based on a theory of "learned helplessness” and to vacate the judgment of conviction on the ground of prosecutorial misconduct.
A summary of the testimony on the issue of defendant as a "battered wife”, the issue of "learned helplessness”, and the death of Herman Smith, Jr., would appear to be as follows: Since their divorce about July, 1977, defendant and Herman Smith, Jr., had been getting along fairly well and defendant had not been physically abused since the divorce decree. That, although Herman Smith was a brutal violent person, defendant had no reason to kill him because of his recent behavior. Several Broome County police officers, defendant’s Family Court attorney, and other witnesses, testified with respect to *777 incidents which occurred during 1974 through 1977 — trussing up defendant, breaking into their various homes, and destruction of property, statements of Herman Smith that "he would get” defendant, physical abuse such as grabbing defendant by the collar, kicking and dragging her down a stairway, blows to the head, and other alleged physical abuse, repeated violations of orders of protection of Family Court, Broome County. That defendant was frightened and in shock, had had a rough marriage, with her life threatened by decedent.
Defendant testified to her marriage in 1970 to decedent at age 18, with Trozell, their son, born in 1972. That Herman Smith was uncontrollable when drinking. Defendant referred to threats and assaults as outlined in the testimony of the witnesses previously noted — that Herman Smith had "beat her up” on the average of twice a week and she had been confined in several hospitals as a result; that she had divorced Herman Smith as she could not take any more beatings.
Defendant denied ever knowing one A1 Smith, who had testified that he had sold her the pistol which caused the death of Herman Smith. She also denied making any statements as testified to by Diane Nelson, and others, to the effect that she wanted to kill Herman Smith and that she had wanted to get some acid to injure him.
With respect to the incidents at the time of death of Herman Smith: On the night in question, defendant had gone to Binghamton, New York, to get her son, Trozell, who had been with Herman Smith, his father. Defendant was living at Owego, New York, at the time, with employment at the IBM Corporation. When defendant got to Binghamton, Herman Smith was playing cards at a residence on Yeager Street, with some apparent drinking. All three then went to the apartment of Herman Smith — decedent and son, Trozell, in his van, and defendant in her truck. They had talked at the apartment for a while about some police reports. Decedent wanted to return to Ithaca, New York, with defendant and their son, and said he would return to Binghamton by bus. Defendant had stated to Herman Smith that she no longer lived in Ithaca. They all left in defendant’s truck with Herman Smith driving. On reaching New York Route 96, he had pulled out a revolver. That they had driven around for a while, stopping at several places in search of a room, which included several stops in Elmira, New York. At one stop in Elmira, at a taxi stand, defendant was crying and decedent had warned her "not to *778 run”. From Elmira, they had then proceeded to Ithaca, where they first stopped at defendant’s old apartment where decedent made defendant get out, still holding the gun, while he checked the apartment to ascertain if defendant still lived there. They had then proceeded to the Holiday Inn at Lansing, New York, where decedent obtained a room. Herman Smith had carried their son into the motel and had ordered defendant to walk ahead of him to their second floor room in the motel.
The gun had been apparent at all times and on arriving at the Holiday Inn, decedent had said, "Don’t try anything — you can’t run from a bullet”. On entering the room defendant was ordered to sit in a corner chair. Their son went to sleep in one of the beds in the room. After a while, decedent kicked off his shoes, got on the other bed in the room, and told defendant to lay on the bed with him.
When decedent began to snore, defendant testified that she waited a few minutes, lying on her right side with her back to decedent; she testified that she had then leaned back, had turned toward Herman Smith, had seen the revolver and was scared. That she had then laid on her back and had reached for the gun. She says that decedent then jumped up and the revolver went off. She then tried to phone for help, banged on some doors, and finally went to the motel office where she had stated that a man was shot. After an ambulance was called, she had returned to the room with a man from the motel. Defendant and son then went to another room where she remained until contacted by State Police Investigator Eisenberg.
On cross-examination, defendant testified that the revolver just went off, that she had never had a gun in her hand before; that Herman Smith’s head and shoulders were off the pillow just before the shot and his waist was down on the bed; that she had taken the revolver from his belt; that on the trip to Ithaca, Herman Smith had the gun in his right hand and drove with his left hand.
There was some evidence in the People’s case relating to the proximity of the revolver to the body of Herman Smith at the time of its discharge.
Defendant alleges, on her motion pursuant to CPL 440.10 (subd 1, pars [f], [g]) that a full evidentiary hearing is required on the grounds, inter alia: Under paragraph (f) of subdivision 1: "Improper and prejudicial conduct not appearing in the *779 record occurred during trial” alleging that the District Attorney in this case engaged in prosecutorial misconduct in asking questions of defendant with respect to matters upon which he had no good faith basis, that the personal life of the District Attorney placed him in a conflict of interest situation requiring him to recuse himself from prosecution of this indictment.
Under paragraph (g) of subdivision 1: "New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial”.
Defendant here asserts the existence of newly discovered evidence consisting of testimony of Dr. Lenore Walker and Dr. Clara Mayo, as contained in affidavit form: The expert opinion of Dr. Walker on the theory of "learned helplessness”, as applied to the "battered woman”, e.g., the battered woman syndrome; and expert opinion of Dr. Mayo on the prevalence of inaccurate and dangerous myths and stereotypes, as allegedly utilized by the District Attorney in his cross-examinatian of defendant and in his summation to the jury. In support of these contentions, as newly discovered evidence, defendant submits the affidavit of Dirk Galbraith, Esq., defendant’s trial counsel, that he had no knowledge of the defense of learned helplessness and no knowledge of the conflict of interest of the District Attorney.
The pivotal issue before this court concerns whether the alleged evidence, submitted by the defendant as part of her motion under CPL 440.10 (subd 1, par [g]), is newly discovered evidence as that term is defined by the New York courts in interpreting the statutory authorization of article 440. The power to grant an order for a new trial, based upon newly discovered evidence, is purely statutory and such power may be exercised by the court only when the requirements of the statute have been satisfied, the determination of which rests in the sound discretion of the court. (People v Wagner, 51 AD2d 186; People v Patrick, 182 NY 131, 177; People v Maynard, 80 Misc 2d 279, 283.)
In People v Salemi (309 NY 208, 215), the Court of Appeals sets forth the criteria which must be satisfied to meet the newly discovered evidence standard of the statute. The decision of the Court of Appeals was rendered under section 465 of the Code of Criminal Procedure, which is substantially identical with CPL 440.10 (subd 1, par [g]). (People v Maynard, supra, p 283.) In Salemi, the court stated (pp 215-216): "The test thus enunciated was long ago approved in this court, and *780 since followed — viz: that 'Newly-discovered evidence in order to be sufficient must fulfill all the following requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and 6. It must not be merely impeaching or contradicting the former evidence.’ (People v. Priori, 164 N. Y. 459, 472; People v. Eng Hing, 212 N. Y. 373, 392.) On this record these criteria are not satisfied.”
The question then becomes whether the expert testimony, relating to defendant’s alleged status as a battered woman, and the claim of defendant of the prosecutor’s exploitation of unfounded myths and stereotypes concerning battered woman, are sufficient to constitute newly discovered evidence under the six criteria noted above. It is to be noted that there is no newly discovered evidence relating to any psychiatric report.
The motion to vacate the judgment of conviction of murder in the second degree is predicated upon a psychiatric theory of defense. As aforestated, under paragraph 9 of his affidavit of September 5, 1979, Attorney Martin Stolar refers to the attached resumé of Dr. Lenore E. Walker, which is identified as new evidence to be offered by defendant covering the battered wife syndrome of "learned helplessness”. "Learned helplessness” is identified by defendant as a recently documented theory which explains the psychological paralysis that maintains the victim status of the battered wife, and that it refutes the major theory of the prosecution’s case that defendant is guilty of murder because she did not attempt to escape from Herman Smith, her gun-carrying former husband, the night of the homicide. Attorney Stolar contends that this theory is new evidence and goes directly to the question of guilt or innocence of defendant on the charge of intentional murder, and that it offers a substantial likelihood that the verdict of the jury on retrial would be to a lesser degree of criminal homicide.
In her eight-page affidavit in support of defendant’s motion, Dr. Lenore Walker states that she has reviewed a partial transcript of the trial and a summary of the testimony of the trial as a whole. Dr. Walker refers to the theory of learned helplessness and the cycle theory of violence as providing a *781 scientifically based explanation for understanding why defendant did not try to escape; that the said behavior of defendant is classically symptomatic of the behavior of battered women in similar circumstances. Dr. Walker indicated that the statements and implications that defendant voluntarily remained and enjoyed the violence of Herman Smith irrevocably damaged the credibility and theory of defense of defendant. Dr. Walker also states: "When someone becomes prey to the psychological condition of learned helplessness, it distorts their feelings, beliefs and behavior so that they react as though they do not have the ability to control what happens to them”; that a battered woman does not like the beatings but likes the loving behavior which occurs after the beating and she becomes submissive and passive. The basic theory of Dr. Walker’s testimony, submitted as "newly discovered evidence”, seems to be self-defense. In paragraph 7 of her affidavit, Dr. Walker states as follows: "Bernadette Powell’s testimony indicates her behavior was similar to other battered women who have killed their batterers in self-defense and the battered women’s reaction to disbelieve the seriousness of the man’s injury when they strike back in self-defense”. As will appear infra, this court does not consider the theory of self-defense, under the battered woman syndrome, as newly discovered evidence. Dr. Walker asserts that the theory of "learned helplessness” and its social/scientific basis is a relatively recent development which did not become generally available until the publication of her book, "The Battered Woman”, published in January, 1979.
While the notion of a "battered woman syndrome” or "learned helplessness” may constitute a unique or novel idea within the scope of a "newly discovered theory of defense”, it is difficult for this court to consider a new theory of defense as ground for reversing a properly conducted and judicially determined verdict. Here the issue of Bernadette Powell, as a battered wife, was in evidence and was an issue before the jury for consideration under the charge of the court which included, inter alla, the defense of justification under article 35 of the Penal Law.
It is the opinion of this court that the defenses available to a battered woman, when charged with a criminal homicide, are already provided for under New York law. The prospective newly discovered evidence testimony of Dr. Walker would appear to be the defense of justification. It may be that she is *782 asserting the battered woman syndrome under the need for more lenient laws of self-defense where battered women are concerned, such as a jury charge of woman’s perspective of her perception of danger.
The court has reviewed the battered woman syndrome theories of Dr. Walker as they may relate to other issues which arise in the framework of criminal homicides such as the defenses of mental disease or defect (Penal Law, § 30.05); and the affirmative defense of "extreme emotional disturbance”, an affirmative defense to murder, second degree. (Penal Law, § 125.25.)
It would seem to this court that "battered woman syndrome” and "learned helplessness” as a defense to assaultive or homicidal behavior, if not within the justification defense of article 35 of the Penal Law, are within the purpose and pattern of the affirmative defense of extreme emotional disturbance, as explained by the Court of Appeals in People v Patterson (39 NY2d 288, 297-302).
In the instant case, this affirmative defense of extreme emotional disturbance, and self-defense under justification, were charged by the court and explained to the jury. The coiirt also charged lesser included homicide counts of manslaughter, first degree, and criminally negligent homicide (Penal Law, §§ 125.10, 125.15, 125.20). The emotional trauma affecting the conduct of the defendant was before the jury. As to the psychological defense of "battered woman” and "learned helplessness”, it is this court’s opinion that the affirmative defense of extreme emotional disturbance represents the psychological boundary available to battered women under New York law. The Court of Appeals in Patterson (at p 303) explained extreme emotional disturbance as representative of the tremendous advances made in psychology and a willingness on the part of the public and the courts and the legislators to reduce the level of criminal responsibility of a defendant upon proof of mitigating circumstances which render his conduct less blameworthy. (People v Lyttle, 95 Misc 2d 879, 884.)
The court finds that the expert testimony sought to be elicited would not change the result if a new trial were granted. The court finds that the proposed testimony of Dr. Walker does not add anything to defendant’s defense in that defendant has already given the jury her history as a battered woman in the context of self-defense and accident. The court *783 finds that the argument of defendant that the use of the alleged female myths by the prosecutor did not destroy defendant’s credibility before the jury, in that the jury rejected any claim of self-defense on the facts. The defendant’s credibility may have been rejected by the jury on her denial of familiarity with the murder weapon when considered against the conflicts with the testimony of the numerous witnesses concerning the gun.
The general rule is that evidence which would merely tend to impeach or discredit the prior testimony of a witness is not such new evidence as to set aside the judgment of conviction. (People v Salemi, 309 NY 208, supra; People v Sherman, 83 Misc 2d 563; People v Maynard, 80 Misc 2d 279, supra; People v Bartholomew, 73 Misc 2d 541.) Significantly, the expert opinion of Dr. Lenore Walker, in its relationship to establishing the credibility by expert opinion and not on any factual basis, would in effect constitute impeachment or discredit of the direct testimony of numerous witnesses, for example, concerning knowledge of defendant of the alleged murder weapon.
The defendant has cited Ibn-Tamas v United States (DC, C A, 1979) and provided the court with the entire opinion of the appeals court. This case was remanded for further proceeding on the basis of possible error of the trial court in excluding testimony of Dr. Lenore Walker as a defense expert on battered women. The defense offered her testimony to describe the "phenomena of wife battery” and to help the jury appraise the credibility of the wife on her contention that she perceived herself in such imminent danger that she shot her husband in self-defense. There the reversal related to possible error in not receiving the testimony of Dr. Walker at the trial. The admissibility of evidence at trial and newly discovered evidence to set aside the verdict of a jury, under the six criteria established in People v Salemi (supra) present entirely different issues. Defense counsel in Ibn-Tamas explained Dr. Walker’s testimony as "providing background data that the trier of fact can use in making the ultimate determination”.
As concerns the alleged prosecutorial misconduct, sought to be addressed under CPL 440.10 (subd 1, par [f]), this court is of the opinion that the District Attorney’s personal life did not affect his performance as an officer of this court and any cross-examination concerning female myths (such as defendant’s potential enjoyment in being beaten by deceased), considered *784 with all the evidence in the case, constituted harmless error. Also, any alleged misconduct on the part of the District Attorney is within the scope of CPL 440.10 (subd 2, par [b]) for the judgment of conviction is still appealable and the trial record can provide adequate review on this issue. The court finds that the opinion of Dr. Clara Mayo, as a social psychologist, with respect to the alleged myths set forth at length in her affidavit, are irrelevant and inadmissible in evidence as not competent to interpret the evidence. Further, it can be argued that the District Attorney had a duty to inquire into defendant’s attitudes toward the beatings to apprise the jury on defendant’s status as a battered woman and to elicit whether defendant provoked the aggressions of Herman Smith.
The motion of defendant to set aside the verdict of guilty is basically a motion based upon expert opinion evidence. The court has examined the supporting affidavits of Dr. Lenore Walker and Dr. Clara Mayo, and finds that the motion is determinable without a hearing in that a hearing is not necessary to resolve any questions of fact. Accordingly, the court in its discretion denies a hearing pursuant to CPL 440.30 (subds 2, 4). (People v Crimmins, 38 NY2d 407, 416.)
The rule of newly discovered evidence sets the strict criteria that new evidence must be of such character as to create the probability it would have resulted in a more favorable verdict. (People v Maynard, 80 Misc 2d 279, 284, supra.)
It must have been discovered since the trial. As previously discussed, the court finds that material contained in the affidavits of Dr. Walker and Dr. Mayo does not meet the requirements of newly discovered evidence. It would not result in a more favorable verdict. As to its discovery, it is the opinion and finding of the court that the defendant, as a battered woman, was known and considered by the jury in reaching its verdict. It would be cumulative to the issue previously considered. (CPL 440.30, subd 7.)
The motion for a new trial, pursuant to CPL 440.10 (subd 1, par [f]) and CPL 440.10 (subd 1, par [g]) is denied in all respects. (People v Salemi, 309 NY 208, supra; CPL 440.30, subd 4.)
[Portions of opinion omitted for purposes of publication.]