| AMOUNT | DESCRIPTION |
|---|---|
| $228,096.00 | Loss of 396 square feet<br>144 square feet back strip (36 × 4)<br>252 square feet side strip (42 × 6)<br>Rent for first floor = $30.00 sq./ft. year<br>Rent for second floor = $18.00 sq./ft. year<br>1st floor 396 × $30.00 = $11,880.00<br>2nd floor 396 × $18.00 = $7,128.00<br>Total lost rent = $19,008 per year<br>× 12<br><br>$228,096.00 |
| 8,812.00 | Tax change—as of January 1, 1987 depreciation for commercial buildings went from 19 years to 31½ years. |
| 9,856.00 | Difference in cost to build a 36 × 46 foot structure two years ago ($142,015.00) and cost today to build a 30 × 42 foot structure ($151,871.00). |
| 250.00 | 6 variance applications at $50 less $50.00 variance refund |
| 4,334.22 | Architectural plan for new 30 × 42 foot building |
| 119,232.00 | Lost rent<br>1st floor 30.00 × 1656 sq. ft. = 49,680<br>2nd floor 18.00 × 1656 sq. ft. = 29,808<br><br>$79,488 a year from November 1, 1985<br>to May 1, 1987 |
| 16,566.00 | Re-excavation |
| 275.00 | Survey required to build 30 × 42 foot building |
| 4,751.65 | Real estate taxes and assessments that tenant would have paid from November 1, 1985 to May 1, 1987 |
| 750.00 | Loss of financing deposit |
| 402,466.80 | Loss of restaurant license (this amount was subsequently dropped when the City granted the license) |

$795,389.67

**STATE of Minnesota, Appellant,**

v.

**JoAnn HENNUM, Respondent.**

**No. C5-87-1524.**

Supreme Court of Minnesota.

June 16, 1989.

794

Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Paul R. Kempainen, Asst. Atty. Gen., St. Paul, and Jerome A. Schreiber, Wabasha Co. Atty., Lake City, for respondent.

POPOVICH, Chief Justice.

Defendant JoAnn Hennum was convicted by jury verdict in Wabasha County District Court of one count of second degree felony murder in violation of Minn.Stat. § 609.19, subd. 2 (1986), in the shooting death of her husband, Robert Hennum. Defendant argues on appeal the trial court erred in ordering defendant to undergo an adverse mental examination by the state's expert and as a result of this examination her constitutional right against self-incrimination was violated. The Minnesota Court of

Appeals in *State v. Hennum*, 428 N.W.2d 859 (Minn.App.1988), reversed the conviction and remanded for a new trial based on these grounds. We affirm the conviction; reverse the court of appeals' order for a new trial; and modify the sentence.

## I.

JoAnn Hennum met Robert Hennum in a Rochester bar, Roxie's, in 1973. JoAnn had previously been married to Ronald Atkinson with whom she had five children. JoAnn divorced Atkinson in 1966 and all five children were living with her at the time she met Robert.

Three or four months after JoAnn and Robert met, Robert moved in with JoAnn and her family in the Broadmore Apartments in Rochester. Robert continued living with JoAnn through a series of moves they made to different locations around the state. They were married in May of 1976 and eventually settled with four of JoAnn's children in a trailer home near Hammond, Minnesota, in May of 1983. The Hennums were residing there at the time of Robert Hennum's death on November 29, 1986.

Throughout their marriage, Robert behaved violently toward JoAnn and her children.[1] On May 15, 1977, JoAnn was taken to a hospital with contusions and scratches on her face and a punctured lung caused by a blow to her ribs inflicted by Robert. On July 2, 1979, Robert attacked JoAnn by kicking her with steel-toed boots, causing a ruptured spleen. Surgery to remove the spleen was required. On July 17, 1982, JoAnn entered the hospital after being hit in the face with a beer bottle by Robert. She suffered a broken nose and severe lacerations on her face as a result of the blow. In March of 1985, Robert Hennum was arrested after another attack on JoAnn and pled guilty to assault.

*The Shooting*

On Thursday evening, November 27, 1986, the Hennum's neighbors, the Potterfs, stopped at the Hennums' trailer with their children. The Potterfs' children, Michael, Jamie and Jada, were allowed to sleep overnight at the trailer.

The following day, Robert left the trailer and went to Freddie's bar where he bought two 12–packs of beer. Robert and another neighbor returned to the Hennum trailer to pick up a log splitter and then left with the three children to split wood and drink beer until about 5:00 p.m. JoAnn and her six-month-old grandson were left alone at the trailer. The Potterfs met Robert at Freddie's Bar in the early evening of November 28. They brought the children back to the Hennum trailer to spend a second night, but Robert stayed at the bar, returning home about 11:30 p.m. He was very drunk.

Upon his return Robert entered the trailer, slamming the door behind him. JoAnn was standing near the stove and Robert pushed her away, shouting, "What's for supper, bitch?" Robert saw some oatmeal left over from breakfast sitting on the stove. He picked up the pan of oatmeal, hit JoAnn with it on the side of the head and dumped the oatmeal on top of her. Jada was awakened by the fighting and saw Robert dump the oatmeal on JoAnn.

Robert then grabbed JoAnn by the hair and began pulling her around the room showing her some cans of chili and telling her to warm some up for him. When she began to prepare the chili, he went after her again, throwing her to the floor and ripping her shirt. Whenever she fell he would grab her back up by the hair. At one point Robert had her pinned to the floor with his hands on her throat.

Eventually, Robert went into the living room and while JoAnn was attempting to cook dinner, he threw a piece of firewood

---

1. The trial court also admitted evidence of several prior bad acts in which JoAnn appeared to be the aggressor. The jury was cautioned to view this evidence as bearing only on the testimony of the two experts regarding JoAnn's mental state. These incidents involved threats against the life of Robert Hennum; taking shots at Robert Hennum from inside their trailer home; kicking Robert and hitting him with her purse when she found him at the house of a neighbor; and scuffling with a neighbor woman whom JoAnn accused of having an affair with Robert.

at her. He then threw a car part at her. JoAnn tried to protect herself by hiding under the kitchen table. Robert grabbed a rocking chair and threw it at her, causing the chair to break.

The fighting woke JoAnn's six-month-old grandson who was sleeping on the couch in the livingroom. The baby started crying. Robert went into the livingroom and pulled the child up by the arm, yelling at him to be quiet. JoAnn told him to put the child down and accused him of beating up on women and children because he could not handle a man. Robert threw the child back on the couch.

He went back at JoAnn, pulling her around again by the hair. He then tore one of the doors off the closet and threw it at her. Coats, folding chairs and three guns fell out of the closet. Robert threw a chair at JoAnn, broke a cupboard into pieces and threw some more firewood. Some of the firewood fell on Jada who was sleeping on the floor in the livingroom. Robert then tore off the rest of JoAnn's shirt and pulled out more of her hair. Finally, he went into the bathroom and Jada came and sat down by JoAnn. Jada picked up a piece of the broken rocker and told JoAnn to hit Robert with it. JoAnn told her no, because if she hit him with it he would just come back at her.

JoAnn testified that while Robert was in the bathroom she went into the bedroom and got another shirt. Robert then came out of the bathroom and went into the bedroom where he fell asleep. JoAnn sat on the floor for awhile while Jada was feeding the baby a bottle. She saw one of the guns lying on the floor and noticed a bullet was sticking out of it. JoAnn testified that she loaded the bullet back into the gun and decided to go in and scare her husband. She went into the bedroom, closed her eyes, and fired the gun.

Jada's testimony differs somewhat from JoAnn's. Jada testified that after Robert Hennum went to bed, JoAnn called her out into the kitchen. JoAnn told Jada that she was going to go into the bedroom and scare Robert so he would not beat her anymore. Jada testified that JoAnn showed her how to load the .30–30 rifle with one of two bullets JoAnn had retrieved. JoAnn placed the second bullet in her back pocket. According to Jada, JoAnn then sat in the kitchen and drank "several" cans of beer. JoAnn got up and went to the bathroom three times while drinking the beer. Before the last trip to the bathroom, JoAnn told Jada to lie down on the couch with the baby. JoAnn took the gun with her when she went to the bathroom the third time. Jada testified that she then heard the bathroom light switch go on and off, the bedroom light switch go on and a gun go off.

After the gunshot, JoAnn told Jada they had to contact her parents and tell them what had happened. JoAnn and Jada with the baby walked to a neighbor's house where they called Jada's parents. The Potterfs arrived at the neighbors, picked up JoAnn, Jada and the baby and drove to the Hennum trailer. They found the trailer in shambles and Robert Hennum dead of a gunshot wound in the bedroom. The Potterfs collected the other children who were still sleeping in the trailer and drove to the Hovde residence where Mrs. Potterf called the police; the Hennums did not have a functioning telephone. The sheriff arrived with two deputies at about 5:55 a.m. JoAnn was questioned by the officers for about two hours and formally arrested at 8:25 a.m.

The sheriff's search of the trailer produced evidence of a disturbance. The officers found broken chairs, cans of chili, firewood and the closet door scattered on the floor. They also found pieces of JoAnn's shirt and clumps of her hair. In the bedroom, Robert Hennum was found dead, lying on his right side with a massive injury to the left side of his head.

An autopsy was performed on Robert. The wound on the left side of his head was consistent with a gunshot injury. The bullet was fired from the .30–30 rifle found in the trailer at a distance of more than 18–24 inches. When the gun was fired it was about 38 inches above the floor. Robert had a blood alcohol concentration of .25. The condition of the body suggested he

was lying on his right side at the time of his death.

JoAnn was also examined by a doctor on November 29. She was found to have multiple abrasions, bruises, and a contusion on the right, back side of her head. These were recent injuries.

*The Trial*

At trial JoAnn admitted killing her husband. Her sole defense was that her actions were taken in self-defense. Defense counsel sought to introduce evidence of "battered woman syndrome" to assist the trier of fact in determining the reasonableness of the defendant's fear at the time she acted and her inability to retreat from the violence. In its March 9, 1987, pretrial order, the court determined JoAnn could offer evidence of battered woman syndrome only on the condition that she submit to an adverse medical examination by an expert appointed by the state. In a memorandum attached to the order the court explained its reasoning:

> The court has determined not to preclude, *as a matter of law*, the defense or theory of self-defense. However, it is apparent from the offers of proof made in support of admissibility of the battered women syndrome, that the state of mind and subjective beliefs of the defendant prior to and at the time of her act is integral to her self-defense theory. Therefore, in order to have a fair opportunity to rebut it, the State should be entitled to have its own expert examine the defendant. The Order further provides that the defendant's expert, Dr. Lynn Powers, is permitted to be present and observe the examination conducted by the state's expert; and the defendant is entitled to immediate discovery of the findings, opinions and conclusions of the State's expert, and their factual bases.

(Emphasis in original.) At trial, the defense offered expert testimony regarding battered woman syndrome. Dr. Lynn Powers described the profile of a battered woman and also stated that in her expert opinion JoAnn Hennum was a battered woman suffering from battered woman syndrome. In her testimony, Dr. Powers referred to JoAnn's feelings on the night of the shooting, which she had discussed with the defendant. In particular she testified that JoAnn was afraid that night. The defendant also took the stand and testified regarding the incidents of that night.

In rebuttal, the state presented the testimony of Dr. Sharon B. Satterfield, the psychiatrist who had conducted the court-ordered adverse medical examination of the defendant. Dr. Satterfield testified JoAnn Hennum did not fit the profile of a woman suffering from battered woman syndrome, even assuming Dr. Powers' profile was correct. She further testified JoAnn was emotionally disturbed and was suffering from alcohol dependence, psychoneurotic depression and an antisocial personality disorder.

Dr. Satterfield's examination of JoAnn was limited because JoAnn refused to discuss the night of the shooting. Defense counsel had advised JoAnn she need not discuss the incidents of the night with Dr. Satterfield. On rebuttal examination the prosecutor asked Dr. Satterfield, "Did you attempt to ask to talk to her about the events of November 28th and 29th of 1986?" Defense counsel objected to this question and the objection was sustained. Later in rebuttal examination, the prosecutor asked Dr. Satterfield, "At any time during your interview with the Defendant did she tell you she was afraid for her life or that of a child on November 29th, 1986?" Dr. Satterfield answered, "No." There was no objection by defense counsel to this question. On recross examination, however, defense counsel clarified for the jury that Dr. Satterfield had never discussed with the defendant the incidents of that night and therefore could not know whether the defendant was fearful at that particular time.

The trial court instructed the jury on intentional murder (Count I), second degree felony murder (Count II), and the law of self-defense. The jury found defendant guilty of second degree felony murder, but not guilty of intentional murder.

## II.

█ This court has never specifically addressed the question of the admissibility of

battered woman syndrome evidence. In *dicta,* the court of appeals stated the admission of such evidence in this case was error since it would not serve to aid the jury. We disagree with this reasoning and choose to address the issue in order to set forth a standard for the admissibility of battered woman syndrome evidence.

The court of appeals relied on this court's decision in *State v. Saldana,* 324 N.W.2d 227 (Minn.1982), which held it was error for a trial court to admit expert testimony as to "rape trauma syndrome" in a rape case. In *Saldana* we set forth guidelines for the admission of expert testimony:

To be admissible, expert testimony must be helpful to the jury in reaching its decision:

> "The basic requirement of Rule 702 is the helpfulness requirement. If the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience, then the testimony does not meet the helpfulness test."
>
> * * * If the jury is in as good a position to reach a decision as the expert, expert testimony would be of little assistance to the jury and should not be admitted.

*Saldana,* 324 N.W.2d at 229 (citation omitted). This court found in *Saldana* that the "scientific evaluation of rape trauma syndrome has not reached a level of reliability that surpasses the quality of common sense evaluation present in jury deliberations." *Id.* at 230.

The majority of states which have examined the admissibility of battered woman syndrome evidence have held it is admissible.[2] Under standards similar to our own, other courts have held that battered woman syndrome is beyond the understanding of the average person and therefore expert testimony should be allowed. *State v. Allery,* 101 Wash.2d 591, 597, 682 P.2d 312, 316 (1984); *Smith v. State,* 247 Ga. 612, 619, 277 S.E.2d 678, 683 (1981); *Hawthorne v. State,* 408 So.2d 801, 807 (Fla. Dist.Ct.App.1982); *Ibn–Tamas v. United States,* 407 A.2d 626, 634–35 (D.C.1979). These courts have admitted expert testimony on this subject (1) to dispel the common misconception that a normal or reasonable person would not remain in such an abusive relationship, (2) for the specific purpose of bolstering the defendant's position and lending credibility to her version of the facts, and (3) to show the reasonableness of the defendant's fear that she was in imminent peril of death or serious bodily injury. Mather, *The Skeleton in the Closet: The Battered Woman Syndrome, Self-Defense, and Expert Testimony,* 39 Mercer L.Rev. 545, 576–77 (1988). We agree expert testimony on this issue is admissible since it would help to explain a phenomenon not within the understanding of an ordinary lay person. In addition we find that this case differs from the rape trauma syndrome in *Saldana,* since the theory underlying the battered woman syndrome is

2. *Ibn–Tamas v. United States,* 407 A.2d 626 (D.C. App.1979); *Terry v. State,* 467 So.2d 761 (Fla. Dist.Ct.App.1985); *Borders v. State,* 433 So.2d 1325 (Fla.Dist.Ct.App.1983); *Hawthorne v. State,* 408 So.2d 801 (Fla.Dist.Ct.App.1982); *Strong v. State,* 251 Ga. 540, 307 S.E.2d 912 (1983); *Smith v. State,* 247 Ga. 612, 277 S.E.2d 678 (1981); *People v. Minnis,* 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209 (1983); *State v. Hodges,* 239 Kan. 63, 716 P.2d 563 (1986); *State v. Hundley,* 236 Kan. 461, 693 P.2d 475 (1985); *State v. Anaya,* 438 A.2d 892 (Me.1981); *May v. State,* 460 So.2d 778 (Miss.1984); *State v. Baker,* 120 N.H. 773, 424 A.2d 171 (1980); *State v. Kelly,* 97 N.J. 178, 478 A.2d 364 (1984); *State v. Gallegos,* 104 N.M. 247, 719 P.2d 1268 (1986); *People v. Emick,* 103 A.D.2d 643, 481 N.Y.S.2d 552 (1984); *People v. Torres,* 128 Misc.2d 129, 488 N.Y.S.2d 358 (N.Y.Sup.Ct.1985); *State v. Leidholm,* 334 N.W.2d 811 (N.D.1983); *State v. Thomas,* 13 Ohio App.3d 211, 468 N.E.2d 763 (1983); *State v. Kelly,* 102 Wash.2d 188, 685 P.2d 564 (1984); *State v. Allery,* 101 Wash.2d 591, 682 P.2d 312 (1984); *State v. Dozier,* 163 W.Va. 192, 255 S.E. 2d 552 (1979); *State v. Felton,* 110 Wis.2d 485, 329 N.W.2d 161 (1983). *But see, Ibn–Tamas v. United States,* 455 A.2d 893 (D.C.1983); *Mullis v. State,* 248 Ga. 338, 282 S.E.2d 334 (1981); *People v. White,* 90 Ill.App.3d 1067, 46 Ill.Dec. 474, 414 N.E.2d 196 (1980); *Fultz v. State,* 439 N.E.2d 659 (Ind.Ct.App.1982); *State v. Martin,* 666 S.W.2d 895 (Mo.Ct.App.1984); *People v. Powell,* 102 Misc.2d 775, 424 N.Y.S.2d 626 (1980); *State v. Thomas,* 66 Ohio St.2d 518, 423 N.E.2d 137 (1981); *Fielder v. State,* 683 S.W.2d 565 (Tex.Ct. App.1985), *jdgmt rev'd by* 756 S.W.2d 309 (Tex. Crim.App.1988); *Buhrle v. State,* 627 P.2d 1374 (Wyo.1981).

beyond the experimental stage and has gained a substantial enough scientific acceptance to warrant admissibility.

 In allowing the admission of battered woman syndrome evidence, we set some limits on the use of expert testimony on this subject. We hold that in future cases expert testimony regarding battered woman syndrome will be limited to a description of the general syndrome and the characteristics which are present in an individual suffering from the syndrome. The expert should not be allowed to testify as to the ultimate fact that the particular defendant actually suffers from battered woman syndrome. This determination must be left to the trier of fact. Each side may present witnesses who may testify to characteristics possessed by the defendant which are consistent with those found in someone suffering from battered woman syndrome. This restriction will remove the need for a compelled adverse medical examination of the defendant. Since the expert will only be allowed to testify as to the general nature of battered woman syndrome, neither side need conduct an examination of the defendant.

### III.

In its pretrial order allowing the admission of battered woman syndrome evidence, the trial court conditioned its ruling on the fact that the defendant would be compelled to submit to an adverse medical examination. The trial court reasoned that in order to rebut the testimony presented by the defense expert who had examined the defendant, the state must have an opportunity to conduct a similar examination. The trial court set forth the following conditions for the examination:

 a. Examination shall be conducted by a qualified psychiatrist, or clinical psychologist, or physician experienced in the field of mental conditions selected by the State.

 b. The defendant's expert, Dr. Lynn Powers, is permitted to be present and observe the examination.

 c. The examination shall be arranged at the earliest opportunity through the good faith cooperation of counsel.

 d. A report of the State's expert setting forth all relevant findings, opinions, conclusions, and their factual bases shall be prepared and a copy provided to the defendant forthwith.

The court of appeals relied on this court's decision in *State v. Olson*, 274 Minn. 225, 143 N.W.2d 69 (1966), to preclude the compelled adverse examination of the defendant. In *Olson*, we were asked to prohibit the compelled psychological examination of a defendant pleading not guilty by reason of insanity. At the time of the decision there was no rule in existence authorizing such an examination and we addressed the question of whether it was "within the inherent power of the district court to order a psychiatric examination to determine criminal responsibility where the statutes of this state are silent as to any procedure concerning it." *Id.* at 226, 143 N.W.2d at 71. We left the decision to the legislature, stating:

 [S]ubstantial questions as to the nature and scope of such an examination would be best solved by a legislative enactment setting down certain guidelines rather than by the courts on an ad hoc basis.

*Id.* at 231, 143 N.W.2d at 73–74. In the absence of such a legislative enactment a court has no legal basis for ordering such an examination. *Id.* at 233, 143 N.W.2d at 75.[3]

 The court of appeals held that, absent a rule of criminal procedure allowing the compelled adverse examination of a defendant for purposes of determining

---

**3.** A rule was later adopted to give courts the authority to order a medical examination of a defendant under certain circumstances. Minn. R.Crim.P. 20.02 provides:

 The court having trial jurisdiction over the offense charged may order a mental examination of the defendant when the defense has notified the prosecuting attorney pursuant to Rule 9.02, subd. 1(3)(a) of an intention to assert a defense of mental illness or deficiency, when the defendant in a misdemeanor case pleads not guilty by reason of mental illness or mental deficiency, or when at the trial of the case, the defendant offers evidence of such mental condition.

whether she suffered from battered woman syndrome, the trial court had no authority to order such an examination. *Hennum*, 428 N.W.2d 859, 868–69. We agree. The trial court had no authority to compel an adverse medical examination of the defendant. We affirm the rationale behind our decision in *Olson* that questions as to the nature and scope of adverse medical examinations are best answered by legislative enactment, rather than by the courts on an ad hoc basis. *Olson*, 274 Minn. at 231, 143 N.W.2d at 73–74.[4] However, we also note that allowing the defense to produce expert testimony based on a medical examination of a defendant without providing the state an opportunity to conduct a similar examination denies the state a fair chance to rebut the expert testimony of the defense. Our decision today will prevent such a situation from arising with regard to expert testimony on battered woman syndrome. In future battered woman syndrome cases, expert medical examination of a defendant will not be necessary since we hold today that expert testimony as to the ultimate fact of whether a particular defendant suffers from the syndrome will be inadmissible. It will be up to the trier of fact to make that finding or conclusion. Therefore, no compelled adverse medical examination, which could possibly jeopardize a defendant's constitutional rights, will be required to insure fairness for the state.

### IV.

■ The court of appeals held defendant's constitutional right to remain silent was violated as a result of Dr. Satterfield's testimony relating her discussions with the defendant. *Hennum*, 428 N.W.2d at 868. We find no constitutional violation. At the time of Dr. Satterfield's examination, the defendant had already voluntarily submitted to an examination by her own expert, Dr. Powers. During this examination the defendant relayed information regarding the events of the night in question, and Dr. Powers subsequently testified to those facts. In addition, the defendant had provided a lengthy statement to the police following her arrest and chose to take the stand herself and testify as to the events of that night. As a result of these actions the defendant waived any right to remain silent, and under these circumstances Dr. Satterfield could testify.

### V.

The court of appeals chose not to address the issues of prosecutorial misconduct and sentencing raised by the defendant on the grounds they were made moot by the court's decision to remand for a new trial. Since we reverse the court of appeals and deny the defendant a new trial, these issues must now be addressed.[5]

■ We find no merit in defendant's argument that prosecutorial misconduct occurred during the discovery process and on closing argument before the jury. We do, however, agree with the defendant that the mitigating factors present in this case justify a downward departure from the presumptive guideline sentence. The presumptive sentence in this case was 105 (102–108) months. The presentence investigation report recommended a downward departure to 54 months. The trial court chose to sentence defendant to 102 months, the minimum presumptive sentence. We believe the presentence investigation rec-

---

4. In 1971 the legislature enacted Chapter 250 providing the supreme court appoint an advisory committee to assist in preparing rules of practice and procedure in criminal actions. In 1974 it enacted Chapter 390 to provide that the new rules of criminal procedure would (with certain exceptions) supersede conflicting statutory law. Such rules have been adopted and amended from time to time. We refer to the Supreme Court Advisory Committee on Rules of Criminal Procedure for their consideration the question of whether a rule allowing adverse medical examinations in cases such as this should be adopted and contain guidelines similar to those set forth in Minn.R.Crim.P. 20.02.

5. We affirm the court of appeals on the other three issues addressed in its decision: (1) The trial court correctly instructed the jury on the law of self-defense; (2) The trial court did not abuse its discretion in allowing testimony of prior bad acts of the defendant; (3) Defendant's failure to request a jury instruction on a claimed lesser included offense waives that issue on appeal.

ommendation of 54 months should be followed in this case.

Minnesota Sentencing Guidelines II.D. 2.a. lists several mitigating factors justifying a downward departure:

(1) The victim was an aggressor in the incident.

(2) The offender played a minor or passive role in the crime or participated under circumstances of coercion or duress.

(3) The offender, because of physical or mental impairment, lacked substantial capacity for judgment when the offense was committed. The voluntary use of intoxicants (drugs or alcohol) does not fall within the purview of this factor.

(4) Other substantial grounds exist which tend to excuse or mitigate the offender's culpability, although not amounting to a defense.

In the present case, the victim physically abused defendant on the night of the incident. In addition, there was substantial evidence that the victim had subjected defendant to severe physical and mental abuse throughout their relationship. While the jury was free to reject defendant's claim of legal self-defense, we believe that "substantial grounds exist which tend to excuse or mitigate [defendant's] culpability, although not amounting to a defense."

We reaffirm our prior statement that it is a "rare" case which merits reversal of the trial court's discretionary refusal to depart. *State v. Kindem*, 313 N.W.2d 6, 7 (Minn.1981). In only one case have we reduced a trial court's sentence to the presumptive sentence because the defendant "lacked substantial capacity for judgment when the offense was committed," due to his mental impairment. *State v. Wall*, 343 N.W.2d 22, 25–26 (Minn.1984). The present case also qualifies as one of those rare cases in which we are justified in interfering with the trial court's decision not to downwardly depart. As such, we reduce the defendant's sentence to 54 months as recommended by the presentence investigation report.

AFFIRMED IN PART; REVERSED IN PART; SENTENCE MODIFIED.