STATE of Minnesota, Respondent,

v.

Lashazo REESE, Jr., Appellant.

No. A03–1887.

Supreme Court of Minnesota.

March 3, 2005.

Ann McCaughan, Office of State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General—Criminal Division, Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Asst. Ramsey County Attorney, St. Paul, MN, for Respondent.

## OPINION

MEYER, Justice.

Lashazo Reese, Jr. appeals his conviction after a jury trial of first-degree premeditated murder, first-degree felony murder, and second-degree attempted murder. Reese claims he was denied his constitutional right to present a complete defense because the trial court refused to allow an expert witness to give an opinion

as to the effects of long-term drug use on a victim's ability to give reliable testimony. Reese also seeks to vacate one of the two judgments of conviction for first-degree murder. We affirm Reese's convictions of first-degree premeditated murder and second-degree attempted murder, and vacate the conviction of first-degree felony murder.

On the evening of August 28, 2002, Reese went to an apartment building on Arcade Street in St. Paul, Minnesota, to sell drugs to acquaintances. There he met Juanita de la Rosa and accompanied her to her apartment to transact business with her. In the early morning hours of August 29, 2002, Jermaine Talley arrived at de la Rosa's apartment in a state of extreme inebriation. He attempted to buy drugs from Reese with a roll of cash. Reese did not make a sale to Talley, but gave Talley his phone number on a slip of paper. De la Rosa placed the slip of paper containing Reese's phone number in her Bible. Talley then fell asleep on de la Rosa's couch with the roll of cash in his hand.

According to de la Rosa, Reese then went into her bathroom. De la Rosa followed Reese to the bathroom to ask him to leave the apartment. When de la Rosa opened the bathroom door, she saw a blanket from her storage area on the bathroom floor. She saw Reese pull a gun from his pants. She turned to flee, but Reese grabbed her and closed the bathroom door. Reese hit her on the head three times with the gun. De la Rosa fell face down on top of the blanket. Reese then put the gun to the back of her neck and shot her three times. De la Rosa lay motionless, pretending to be dead.

According to de la Rosa, Reese then left the bathroom and a short time later she heard a shot from the living room. She then heard Reese leave the apartment.

De la Rosa made her way to a neighboring apartment, where a neighbor assisted her in calling 911. First responders received the call at 3:00 a.m. Talley was found dead on the couch where he had been sleeping, the roll of cash missing. Neither the money nor the murder weapon was ever recovered.

De la Rosa's story was corroborated in certain respects by physical evidence, such as the presence of Reese's phone number in the Bible, the blanket on the bathroom floor, and the location of a beer can that Reese and de la Rosa had used as a crack pipe earlier in the evening. There was also circumstantial evidence implicating Reese in the shootings. Jean Duncan, a tenant in the apartment next door to de la Rosa, testified to hearing de la Rosa screaming, followed by the sound of three gunshots. A few minutes later, Duncan saw a man wearing a gray tee-shirt leaving de la Rosa's apartment. Duncan recognized the shirt as the same one Reese had been wearing earlier that evening. Another neighbor, Denise Larson, testified to hearing a "loud boom." Larson helped de la Rosa call 911 after de la Rosa came to her door, screaming for help. Cassie Smith, a friend of Reese's with whom Reese stayed in the days after the shootings, testified that Reese was "edgy" during those days, that he told her he was in "big trouble," and that he talked about a man who had died, a woman pistol-whipped in a bathroom, and the money. Another friend of Reese's, Gregory Starwood, testified that Reese called him shortly after the shooting and told him that he had killed a man after the man refused to pay a drug debt. According to Starwood, Reese asked for his help in getting out of town.

Reese's testimony sharply conflicted with de la Rosa's account of the shootings. Reese claimed that he left de la Rosa's

apartment shortly after 2:00 a.m. and was not present when the shootings took place. Two alibi witnesses corroborated his story.

During discovery, Reese requested de la Rosa's medical records.[1] He received all records dating from the time of the shootings but also inadvertently received several records from a prior hospitalization in 2000. The prior records described de la Rosa's drug and alcohol use and included a summary of the results of several neurological and psychological tests performed on de la Rosa. The state filed a motion in limine, requesting exclusion of all of de la Rosa's prior medical records. Reese filed a counter-motion requesting an in camera review of the prior records and a determination that those records could be admitted into evidence as "relevant to [de la Rosa's] competence and ability to testify." Reese also sought permission to have his medical expert review de la Rosa's prior medical records for the purpose of giving an opinion regarding whether her drug use may have affected her memory and reliability. De la Rosa did not consent to the evidentiary use of her prior medical records.

The trial court made a preliminary ruling, subject to change after de la Rosa's testimony, that admission of the records would be denied because the records were protected by medical privilege. The trial court also ruled that Reese's expert could testify generally about the physiological effects of drug use and paint sniffing on the brain. However, the expert was prevented from testifying in particular about the effects of drug use upon de la Rosa because that opinion would invade the province of the jury.

Before trial, Reese renewed his motion for in camera review of de la Rosa's complete medical and psychiatric records, ad-

mission of the prior medical records into evidence, and permission to elicit expert testimony as to "the effects of Ms. De La Rosa's prolonged exposure to drugs and/or chemicals, paint sniffing, depression, and other relevant information" on her ability to function and recall events. Reese claimed that these requests were necessary to effectively challenge de la Rosa's reliability and that the evidence would show that this eyewitness's reliability was "compromised because of her extensive paint-sniffing and crack cocaine use." The state, for its part, filed a motion to preclude Reese from offering "any expert testimony as to the mental ability of a witness or of that witness's 'competent' memory of the events of August 28–29, 2002."

During trial, Reese twice renewed his request for an in camera review of de la Rosa's prior medical records and argued that expert testimony would be helpful to the jury because of the unfamiliarity to the layperson of the "effects of paint sniffing" over time. The trial court reviewed the records in camera and ruled that they were not admissible but that they could be used for the limited purpose of cross-examination and impeachment of de la Rosa. The court further ruled that an expert witness could testify as to the effects of paint sniffing generally, but could not review de la Rosa's prior medical records or give an expert opinion as to the reliability of her testimony.

Reese did not call an expert witness to the stand but did use de la Rosa's prior medical records to impeach her testimony about her history of drug use, depression, and drinking. After a three-day trial, Reese was convicted of first-degree premeditated murder, first-degree murder during the commission of an aggravated

---

1. De la Rosa had provided a signed medical release to allow the defense access to her medical records from the time of the shootings.

robbery, and attempted second-degree murder. The court imposed a mandatory life sentence for the first-degree premeditated murder and a 151–month commitment to the Commissioner of Corrections for the attempted second-degree murder, to be served consecutively. The court also ordered Reese to pay $7,584.66 in restitution for funeral expenses of the decedent.

## I.

■ Reese claims that his constitutional due process right to present a meaningful defense was seriously undermined by the trial court's refusal to allow expert testimony about de la Rosa's ability to process information reliably. Reese suggests that examination of de la Rosa's prior medical records would have led his expert to testify that a person with de la Rosa's history was not capable of processing information reliably. Reese argues that the excluded medical evidence was potentially exculpatory and relevant to his defense that he did not commit the shootings because it could have established that de la Rosa was unreliable and mistaken in her identity of the shooter.

■ It is well established that a criminal defendant has a constitutional due process right to present a meaningful defense. *See Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Bixler v. State,* 582 N.W.2d 252, 255 (Minn.1998). This right is comprised, at a minimum, of the right to examine the witnesses against the defendant, to offer testimony, and to be represented by counsel. *Chambers,* 410 U.S. at 294, 93 S.Ct. 1038. However, the defendant must still comply with established rules of evidence designed to assure both fairness and reliability in assessing guilt or innocence. *State v. Wolf,* 605 N.W.2d 381, 384 (Minn. 2000).

■ A trial court has broad discretion as to evidentiary matters and we will not overturn a trial court's rulings on such matters on appeal absent a clear abuse of this discretion. *State v. Chambers,* 589 N.W.2d 466, 475 (Minn.1999). Admission of expert testimony is considered to rest within the sound discretion of the trial court and will not be reversed unless there has been clear error. *State v. Koskela,* 536 N.W.2d 625, 629 (Minn.1995).

Several established rules of evidence are pertinent to the issue of the expert testimony sought by Reese. First, Rule 702 states that expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. We have read this rule as a helpfulness requirement: if the subject of the testimony is within the knowledge or experience of a lay jury and the expert would not be able to deepen the jury's understanding, then the testimony does not meet the helpfulness requirement and is not admissible. *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980). Minnesota Rule of Evidence 403 acts as an additional filter, allowing exclusion of otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn. R. Evid. 403.

Reese argues that his expert's testimony about the "long-term neurological effects" of paint sniffing is beyond the knowledge and experience of the average jury, and that therefore it meets the helpfulness requirement. The state concedes that this may be so, but notes that the trial court was willing to allow Reese's expert to testify generally as to the effects of paint sniffing. The state notes that the only testimony the trial court excluded was a specific

application to de la Rosa, based on the expert's review of de la Rosa's prior medical records. According to the state, specific expert testimony about the long-term effects of paint sniffing on de la Rosa's ability to process information reliably would amount to a determination of de la Rosa's credibility. The state argues that since only a jury may assess witness credibility, the trial court's decision to exclude this specific testimony comports with prior case law and the trial court's sound discretion.

■■■■ We agree that assessment of witness credibility is a jury function. *See* Minn. R. Evid. 608 (credibility of a witness may only be attacked or supported by opinion or reputation evidence concerning the witness's truthfulness, and only after the character of the witness for truthfulness has been attacked by the adversary); *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guide, Criminal,* CRIMJIG 3.12 (4th ed.1999) (jury members are the sole judges of whether a witness is to be believed and of the weight to be given a witness's testimony). An expert witness may not testify as to the credibility of a specific witness, though the expert may be able to testify generally as to certain psychological or physiological conditions that may affect credibility, if such testimony is beyond the knowledge and experience of an average jury. *See Koskela,* 536 N.W.2d at 630 (holding that the trial court did not abuse its discretion in limiting expert testimony to general information about the nature of schizoid personality disorder rather than specifically assessing the defendant, because whether the defendant fit the disorder profile was a question for the jury); *State v. Ritt,* 599 N.W.2d 802, 812 (1999) (holding that the trial court was within its discretion in excluding expert testimony about the effects of coercive interrogation

on a particular defendant, saying that this was a question for the jury's determination); *State v. Saldana,* 324 N.W.2d 227, 231 (Minn.1982) (stating that expert opinions concerning a witness's capacity to perceive the world around him or her "are generally inadmissible because such opinions invade the jury's province to make credibility determinations."). Given this general rule, we must determine whether any exceptions apply. "Expert testimony concerning the credibility of a witness should be received only in 'unusual cases.'" *Saldana,* 324 N.W.2d at 231.

Whether an expert witness may give an opinion that a victim's drug use has affected that victim's ability to give reliable testimony is a matter of first impression in this state. In other circumstances, we have held that an expert could not give an opinion on an ultimate fact. In *State v. Hennum,* 441 N.W.2d 793 (Minn.1989), we held that expert testimony was allowed on battered woman syndrome, but that such testimony was to be limited to "a description of the general syndrome and the characteristics which are present in an individual suffering from the syndrome. The expert should not be allowed to testify as to the ultimate fact that the particular defendant actually suffers from battered woman syndrome." *Id.* at 799. We reasoned that this final determination was a jury question. *Id.* Similarly, in *Koskela* we held that the trial court's decision to allow expert testimony as to the nature of schizoid personality disorder, but not as to whether the defendant fit the disorder, was well within the trial court's discretion and was not erroneous. 536 N.W.2d at 630.

In only one case have we held that an expert could give an opinion that a victim's allegations were not fabricated. In *State v. Myers,* 359 N.W.2d 604 (Minn.1984), we held that an expert could offer an opinion

that a specific minor complainant's allegations about sexual abuse were not fabricated, in addition to testifying about the behavior and symptoms typically exhibited by sexually abused children. *Id.* at 606. We noted that "[i]n most cases, even though an expert's testimony may arguably provide the jury with potentially useful information, the possibility that the jury may be unduly influenced by an expert's opinion mitigates against admission." *Id.* at 610. In *Myers,* however, the defendant had called the child complainant's credibility into question by cross-examining the child's mother as to the child's truthfulness, thereby "opening the door" to the expert's opinion testimony as to the child's truthfulness. *Id.* at 611. The expert's opinion testimony was allowed because "[h]aving sought * * * to discredit the child's credibility by showing that the child's mother (the ultimate 'expert' with respect to the complainant) did not believe [the child] for several months, the defendant must be said to have waived objection to responsive opinion testimony[.]" *Id.* at 611–12.

Reese's case is factually dissimilar to *Myers.* In this case, Reese attempted to establish through expert testimony that long-term drug use can affect a person's reliability *and* that in the opinion of the expert de la Rosa's long-term drug use had caused her to be an unreliable witness. While it is true that attacking de la Rosa's credibility was central to the defense strategy, her credibility was clearly susceptible to cross-examination, particularly since her prior medical records were made available for impeachment purposes. This court has been "very reluctant to allow experts to testify about matters that are generally for the jury's determination and are susceptible to cross-examination." *Ritt,* 599 N.W.2d at 812. The ultimate question was whether de la Rosa was a credible witness and on that question the jury should be

the sole judge of whether a witness is to be believed and the weight to be given the witness's testimony. This is not the "unusual case" contemplated by *Saldana.* Therefore, we hold that the trial court did not abuse its discretion in limiting the expert witness's testimony.

## II.

■■■■ We turn to the second evidentiary issue: whether the trial court erred in limiting the disclosure of de la Rosa's prior medical records based on medical privilege. Generally, a crime victim's past medical records are protected from disclosure by the physician-patient privilege. Minn.Stat. § 595.02, subd. 1(d) and (g) (2004). However, "the medical privilege, like other privileges, sometimes must give way to the defendant's right to confront his accusers." *State v. Kutchara,* 350 N.W.2d 924, 926 (Minn.1984). This court has held that the proper procedure is generally for the trial court to review the medical records at issue in camera to determine whether the privilege must give way. *Id.* "The in camera approach strikes a fairer balance between the interest of the privilege holder in having his confidences kept and the interest of the criminal defendant in obtaining all relevant evidence that might help in his defense." *State v. Hummel,* 483 N.W.2d 68, 71–72 (Minn.1992) (quoting *State v. Paradee,* 403 N.W.2d 640, 642 (Minn.1987)).

In the present case, the trial court performed an in camera review of de la Rosa's prior medical records, as requested by Reese. The trial court allowed Reese to use the records for the limited purpose of impeaching de la Rosa's testimony, but prohibited further disclosure of the records. The trial court refused to allow Reese's expert to review the records. It was not error to refuse to allow the expert access to the prior records because the

expert could not properly base an opinion on them; i.e., the expert was limited to testifying about the effects of long-term drug use generally, not as it relates to de la Rosa specifically. The court conducted an in camera review of the records, and determined that Reese could use them for impeachment purposes, but struck a balance in the interest of de la Rosa's medical privilege and ruled the records themselves to be inadmissible. This evidentiary decision was well within the trial court's discretion and we find no error.

### III.

 The appellant argues that the trial court erred in entering judgments of conviction for both first-degree premeditated murder and first-degree murder during the commission of an aggravated robbery. The state concurs that the trial court erred.

■ Minnesota Statutes § 609.04 (2004) provides that "[u]pon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both." Thus, the statute bars more than one conviction for the same offense by a defendant against the same victim on the basis of the same act. *State v. Ture*, 353 N.W.2d 502, 517 (Minn. 1984); *see also State v. LaTourelle*, 343 N.W.2d 277, 284 (Minn.1984); *State v. Koonsman*, 281 N.W.2d 487, 489–90 (Minn. 1979). Therefore, a defendant may not legally be convicted of two counts of first-degree murder when both convictions are for the same offense, are on the basis of the same act, and involve the same victim. *Ture*, 353 N.W.2d at 517. Based on the plain language of the statute and our previous decisions interpreting the statute, we hold that the trial judge erred in entering judgments of conviction for both murder charges, and we vacate the judgment of

conviction for first-degree murder during the commission of an aggravated robbery.

In a pro se supplemental brief, Reese also requests that we "preserve his rights" as to four legal claims: ineffective assistance of counsel; "witness tampering on behalf of D.A.'s office"; credibility of witnesses; and denial of admissible evidence. Reese argues that because he has been in segregation since April 4, 2004, he has been unable to provide any case law to develop his positions on these issues. The claims of denial of admissible evidence and credibility of witnesses have been presented by Reese's counsel and decided above. As to the remaining two claims, we have held that once a direct appeal has been taken, "all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief." *State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976). But Reese's claims may be presented on postconviction appeal under the interests of justice exception to the *Knaffla* rule, if Reese can establish that fairness so requires. *See Fox v. State*, 474 N.W.2d 821, 825 (Minn.1991).

Affirmed in part and reversed in part.