**STATE of Minnesota, Respondent,**

**v.**

**Betsy Marie HANKS, Appellant.**

**No. A11–0749.**

Supreme Court of Minnesota.

Aug. 1, 2012.

Lori Swanson, Attorney General, Saint Paul, MN; and Timothy R. Faver, Beltrami County Attorney, Annie P. Claesson–Huseby, Chief Assistant County Attorney, Bemidji, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Sharon E. Jacks, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

MEYER, Justice.

A jury found Betsy Marie Hanks guilty of first- and second-degree murder for the shooting death of her romantic partner, Matthew Albert. In preparation for trial, Hanks sought and received funding from the district court to hire an expert witness on battered woman syndrome. At trial, the district court granted the State's motion to prohibit the expert from testifying. After the guilty verdicts were returned, the district court convicted Hanks on both counts of murder. On appeal, Hanks asserts that the district court erred by excluding the battered woman syndrome expert testimony, by excluding other evidence, and by entering convictions on both first- and second-degree murder for a single act. We affirm the conviction for first-degree murder.

I.

Betsy Marie Hanks first met Matthew Albert in 2001, when she was 17 years old. Over the next 8 years, Hanks and Albert lived together, considered marriage, and had four children together. Hanks and Albert had a troubled relationship. Hanks

testified that Albert did not want her to work outside the home, although the couple lived paycheck to paycheck. Albert restricted Hanks's other activities outside the home, including social activities with friends and family. Albert controlled the couple's finances and withheld money from Hanks even when he was out of town. One family member described Albert as "very, very controlling."

Albert was a construction worker, working out of town most of the summer of 2009. That summer Hanks met L.G., who worked on a nearby cattle ranch. Hanks and her sons spent a great deal of time with L.G., assisting him with his work on the ranch and riding horses with him. L.G. and Hanks became very good friends, but both denied at trial that they were romantically involved.

The State introduced evidence at trial that Hanks and L.G. were having an affair. A friend of Hanks and Albert testified that he saw Hanks at L.G.'s residence with her hair tousled and her clothes askew. The State introduced a letter from Hanks to L.G. in which she wrote that she did "not regret *any* of what we have done. It felt great with you. I know it is not right." Albert strongly disapproved of Hanks's friendship with L.G.

On October 19, 2009, the day before the murder, Hanks went to visit L.G. When Albert discovered that Hanks was with L.G., he drove around looking for L.G. He eventually found L.G. and allegedly attempted to hit L.G. with his vehicle. Albert was cited for reckless driving for the incident. Albert told the two officers who responded to the incident that Albert was considering leaving Hanks because Hanks was "messing around." Albert asked the officers if he could remove his belongings from the home he shared with Hanks. Later in the day, Hanks's father attempted to mediate a reconciliation of sorts between Hanks and Albert. The three of them talked past midnight and came to an agreement that Albert would spend less time away from home and Hanks would stop spending time with L.G.

The morning of October 20, Albert got the two older children ready for school, ran an errand, fed the youngest two children, and then went back to bed. Hanks lay on the bed with Albert for a while, then got up and placed the two youngest children in her vehicle. She then returned to the house to retrieve a pair of boots for one of the children. Hanks would later tell investigators that she "paced around the house trying to figure out what to do" and "decided that it was the time to make things right." She then retrieved Albert's gun from under the bed and shot him in the head. When interviewed by investigators, Hanks said she was not thinking about shooting Albert when she left the house to put the children in the vehicle, and did not think about it until she returned to the house. When asked how long she contemplated shooting Albert, Hanks repeatedly asserted that it was "[n]ot very long."

After shooting Albert, Hanks left the house, drove to her father's house, and discarded the gun in a ditch before returning home. When Hanks returned home, Albert was still alive. Hanks called 911 and told the dispatcher that she had found her husband with a gunshot wound to his head, she did not know what had happened, and Albert's gun was missing. Albert was taken to the hospital and died later that day as a result of the gunshot wound.

After Albert was taken to the hospital, Hanks spoke with an investigator from the Beltrami County Sheriff's Department. Hanks explained the events of the previous day, including Albert's attempt to hurt L.G. and her long discussion with Albert

about their relationship. Hanks denied shooting Albert. Two days later she was again questioned by an investigator, who challenged the story Hanks had earlier given. In response, Hanks first said that her three-year-old had been holding the gun and it discharged as she attempted to take it from him. On further questioning, Hanks told a different story—she admitted shooting Albert but claimed Albert was suicidal and asked Hanks to end his life for him. When the investigator told Hanks he did not believe this story either, Hanks said she shot Albert because she wanted a better father for her children who "treated them like people." Hanks also told the investigator that Albert said if Hanks ever took their children "he'd make sure that was the last time I'd see 'em." As a result of this threat, Hanks wanted to "make it so [Albert] can't interfere." Hanks told the investigator that she dropped the gun in a ditch after the shooting. Hanks also said that when she returned after disposing of the gun and discovered Albert alive, she called 911 because she wanted Albert to live.

On October 26, 2009, the State charged Hanks with second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2010). A grand jury later indicted Hanks for both first-degree premeditated murder and second-degree intentional murder, Minn.Stat. § 609.185(a)(1) (2010); Minn. Stat. § 609.19, subd. 1(1). Before trial, the district court granted Hanks's motion for an award of fees to hire a psychiatrist to examine her and assist in her defense. The district court later granted Hanks's motion for fees for an expert witness on battered woman syndrome. In January 2011, prior to trial, the State filed a motion to prohibit the battered woman syndrome expert from testifying, arguing that Hanks had not shown she was a battered woman, making battered woman syndrome expert testimony irrelevant and highly prejudicial.

The court addressed the State's motion on the first day of trial. The defense offered a summary of the battered woman syndrome expert's testimony as well as summaries of witness statements, which included statements about Albert's alleged controlling and violent behavior. Defense counsel stated that "the proffered reason for using [battered woman syndrome expert testimony] is to contradict any claim by the State that there was premeditation ... here." The defense also asserted that battered woman syndrome expert testimony would help explain why a battered woman might change her story. The defense asked the court to delay ruling on the admissibility of the expert testimony until after Hanks testified.

The next day the court ruled that "the testimony of an expert [about battered woman syndrome] in this case [does not] fit[ ] any of the prior decisions that the Courts of Minnesota have held that such testimony is admissible." The court explained that because Hanks was not claiming she acted in self-defense, the testimony could not come in under *State v. Hennum*, 441 N.W.2d 793, 797–99 (Minn. 1989). The court distinguished *State v. Grecinger*, 569 N.W.2d 189, 196–97 (Minn. 1997), noting that the testimony in that case explained "why a woman would keep returning to an abuser and why a woman would change her story in order to maintain that relationship." Because Hanks was neither returning to an abusive relationship nor attempting to maintain an abusive relationship, the court found *Grecinger* likewise inapplicable. Therefore, the court ruled, "I just don't see that expert testimony should be allowed, and I am not going to allow it."

Hanks testified that on the day of the shooting, she and Albert were up fighting until four or five in the morning. She was

exhausted and felt like her head was "exploding." When she returned to the house to get her child's boots, Albert was lying in bed handling the gun, saying that he wanted to be in a safe or better place. Hanks said she did not remember holding the gun or pulling the trigger, but admitted to shooting Albert. She testified that she did not plan or intend to shoot Albert.

The jury found Hanks guilty of both first- and second-degree murder. The district court adjudicated Hanks guilty of both first- and second-degree murder. The court sentenced Hanks to life imprisonment without the possibility of release for first-degree murder. On appeal, Hanks claims: (1) the district court committed reversible error when it excluded expert testimony on battered woman syndrome; (2) she was denied her constitutional right to present a complete defense by certain evidentiary rulings; and (3) the district court erred in convicting her of first- and second-degree murder committed against one victim.

## II.

■ We first consider the question of whether the district court violated Hanks's constitutional right to present a defense when it excluded expert testimony on battered woman syndrome. A criminal defendant has the right to call and examine witnesses, subject to the limitations imposed by the rules of evidence. *State v. Richards,* 495 N.W.2d 187, 195 (Minn. 1992). Generally, evidentiary rulings rest within the sound discretion of the trial court and "will not be reversed absent a clear abuse of discretion." *State v. Glaze,* 452 N.W.2d 655, 660 (Minn.1990). "When the admissibility of evidence is challenged on appeal, we defer to the district court's exercise of discretion in the conduct of the trial, and we will not lightly overturn a district court's evidentiary ruling." *State*

*v. MacLennan,* 702 N.W.2d 219, 235 (Minn.2005).

■ Expert witness opinion testimony is permitted if the expert's specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. We have recognized that battered woman syndrome expert testimony is admissible in at least two contexts: when a battered woman claims self-defense for the murder of her abuser, *State v. Hennum,* 441 N.W.2d 793, 797–99 (Minn.1989), and when the State seeks to rehabilitate the credibility of a battered woman in the prosecution of her batterer, *State v. Grecinger,* 569 N.W.2d 189, 196–97 (Minn.1997). Generally, battered woman syndrome expert testimony may be helpful to juries because battered woman syndrome "is beyond the understanding of the average person," and expert testimony may "help to explain a phenomenon not within the understanding of an ordinary lay person." *Hennum,* 441 N.W.2d at 798.

In *Hennum,* we noted that battered woman syndrome testimony is admissible

(1) to dispel the common misconception that a normal or reasonable person would not remain in such an abusive relationship, (2) for the specific purpose of bolstering the defendant's position and lending credibility to her version of the facts, and (3) to show the reasonableness of the defendant's fear that she was in imminent peril of death or serious bodily injury.

*Id.* The battered woman syndrome expert testimony in *Grecinger* helped to explain why a victim returned to an abusive relationship, recanted her statements to police, and waited three years to pursue prosecution of the perpetrator. 569 N.W.2d at 195. The court noted that these behaviors are characteristic of a woman suffering from battered woman syndrome and are

outside the understanding of an ordinary lay person; without the expert testimony, the behaviors "might otherwise be interpreted as a lack of credibility." *Id.*

■ The district court in this case ruled that the proffered battered woman syndrome expert testimony was inadmissible, stating: "I am not convinced that the testimony of an expert in this case fits any of the prior decisions that the Courts of Minnesota have held that such testimony is admissible." The court determined that *Hennum* did not apply because Hanks did not raise self-defense. The court also determined that *Grecinger* "permitted expert testimony as helpful to a jury in understanding" "the dynamics of abusive relationships and why a woman would keep returning to an abuser and why a woman would change her story in order to maintain that relationship." The court concluded that *Grecinger* did not apply because Hanks was neither returning to an abusive relationship nor trying to maintain it. Instead, the court stated that Hanks sought admission of the battered woman syndrome testimony to "prove self serving changes in her statement."

Hanks argues that the expert testimony was admissible because it was relevant, helpful to the jury, and not unduly prejudicial. Hanks argues that the battered woman syndrome expert testimony is relevant because it would show that "women who are battered or controlled act in ways similar to [her]." Hanks asserts that the battered woman syndrome expert testimony would have explained her actions, including her contradictory statements. Hanks emphasizes that "domestic violence is not limited to battering" and asserts that her offer of proof, which included evidence of controlling behavior and threats, established the type of relationship about which the battered woman syndrome expert would testify. Ultimately,

Hanks argues that battered woman syndrome expert testimony was relevant to the issue of premeditation, and that the battered woman syndrome expert would have explained how Albert's controlling behavior impacted Hanks and prevented her from premeditating or forming intent to kill him.

The State argues that the battered woman syndrome expert testimony was irrelevant and the defendant never made a "threshold showing" that Hanks "was in fact abused." The State asserts that "there was no evidence of the type of relationship that would give rise to [b]attered [w]oman [s]yndrome," and therefore the battered woman syndrome testimony was irrelevant and highly prejudicial.

■ Minnesota Rule of Evidence 402 provides that "[e]vidence which is not relevant is not admissible." Relevant evidence is defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Rulings on the relevancy of evidence are generally left to the sound discretion of the trial court. *State v. Ture,* 632 N.W.2d 621, 631 (Minn.2001).

■ In determining the relevance of battered woman syndrome evidence, we consider whether the proffered evidence demonstrated that the proponent had the type of relationship about which the expert will testify. *MacLennan,* 702 N.W.2d at 235 (holding that the defendant had not established the relevance of expert testimony on battered child syndrome because there was "little demonstrable evidence of the type of relationship described by [the defendant's] expert that would give rise to battered child syndrome"). The defendant in *MacLennan* testified that he was afraid of the victim (his father) and that the victim had physically abused him on one

occasion. The majority of MacLennan's offer of proof consisted of evidence that the victim had a bad temper and had neglected MacLennan. We concluded that such evidence of a "tense relationship" was insufficient to establish the type of relationship that would give rise to battered child syndrome, and so the expert testimony was irrelevant. *Id.*

It was not an abuse of discretion for the district court to conclude that the evidence in Hanks's offer of proof was similarly deficient in failing to establish the type of relationship that would give rise to battered woman syndrome. Hanks's offer of proof asserted the following: Albert was not involved in the lives of his children. Albert preferred that Hanks stay at home with the children rather than work outside the home. Albert controlled the family finances and did not give Hanks money. Albert got angry when Hanks went out socially and "wanted [Hanks] socially isolated." Albert disabled Hanks's vehicle so she could not drive it. Albert made threats to kill L.G., Hanks, his children, and himself. One of Hanks's children stated that "Dad hit mom!"

Hanks's expert defined battering as "a pattern of physical and psychological coercion that may create ongoing fear of safety among victims" and stated that battered woman syndrome explains "how women react to ongoing battering." We conclude that Hanks's offer of proof established that Albert was controlling and had a bad temper, but the proof was insufficient to establish that Hanks was a victim of battered woman syndrome. Notably, Hanks never claimed that Albert physically abused her or even that she was afraid of Albert. At most, she was afraid that Albert would hurt her children if she left him. The district court did not abuse its discretion in finding that the evidence of a troubled relationship between Hanks and Albert

was insufficient to establish the type of relationship that would give rise to battered woman syndrome and that, therefore, the expert testimony was irrelevant. The district court thus did not err in excluding the testimony.

### III.

■ We next consider whether the district court violated Hanks's constitutional right to present a defense when it excluded evidence of alleged threats made by Albert to harm Hanks, the children, L.G., and himself, and evidence that L.G. observed bruises on Hanks during the summer of 2009. We review the district court's evidentiary rulings for an abuse of discretion. *State v. Stone,* 784 N.W.2d 367, 370 (Minn.2010).

Hanks argues that the district court "tied defense counsel's hands by excluding evidence of Albert's physical abuse and threats." Hanks further argues that she had "a due process right to testify about her intent and motives and explain her conduct to the jury" and that "the judge's order denied [her] the right to fully explain her intent and conduct."

Our review of the record reveals that the district court's evidentiary ruling was not as expansive as Hanks claims. On the second day of trial, the district court considered the admissibility of two pieces of evidence contained in Hanks's offer of proof. First, L.G. stated that he observed bruises on Hanks several times during the summer of 2009 and that Hanks had suspicious explanations or no explanation for these bruises. Second, L.G. stated that he heard Albert threaten to kill L.G., Hanks, the children, and himself. Another witness stated that Albert threatened to kill himself. Defense counsel stated he did not object to excluding reports of threats and bruises by these two witnesses. The court

then ruled and narrowly excluded only this evidence.

Further, the court did not issue a broad ruling excluding all "evidence of Albert's abuse," as Hanks suggests. The court was careful not to place any limits on Hanks's testimony. In ruling on the admissibility of the reports of threats and bruises, the court explained that Hanks and her attorney "will be permitted to talk about the relationship, in terms of the ups and downs, the controlling ..." The district court, therefore, did not prevent Hanks from testifying about the nature of her relationship with Albert or from explaining her conduct to the jury. *See State v. Brechon*, 352 N.W.2d 745, 750–51 (Minn. 1984) (explaining that the right to present a defense encompasses the defendant's right to explain her conduct to the jury).

After a thorough review of the record, we conclude that the district court did not abuse its discretion in narrowly excluding the evidence of Hanks's bruises and Albert's threats as identified in the offer of proof. Further, the court did not place any limits on Hanks's ability to fully explain her relationship with the victim. Accordingly, Hanks's constitutional right to present a complete defense was not violated by the district court's evidentiary ruling.

IV.

 The jury found Hanks guilty of both first-degree and second-degree murder and the district court adjudicated Hanks guilty of both offenses.[1] The parties agree that this was error because a defendant may not be convicted of two offenses if the convictions are based on the same conduct committed against the same victim. *See* Minn.Stat. § 609.04 (2010); *State v. Pippitt*, 645 N.W.2d 87, 96 (Minn.

2002) (a defendant cannot "legally be convicted of two counts of ... murder where both convictions were for the same offense on the basis of the same act involving the same victim" (citation omitted) (internal quotation marks omitted)). Therefore, we hold that the district court erred in convicting Hanks of both murder offenses. We reverse and remand to the district court to vacate Hanks's conviction for second-degree murder.

Affirmed in part, reversed in part, and remanded.

---

1. The court only imposed sentence on the first-degree murder conviction.