*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-0062**

State of Minnesota,
Respondent,

vs.

Livinus Ndubisi Ezeobi,
Appellant.

**Filed January 11, 2016**
**Affirmed**
**Schellhas, Judge**

Stearns County District Court
File No. 73-CR-14-1371

Lori Swanson, Attorney General, Karen B. Andrews, Assistant Attorney General, St. Paul, Minnesota; and

Janelle Kendall, Stearns County Attorney, St. Cloud, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Rodenberg, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SCHELLHAS**, Judge

Appellant challenges his conviction of terroristic threats, arguing that (1) the district court abused its discretion by admitting expert testimony on battering, (2) the evidence was

insufficient to support his conviction of terroristic threats, and (3) the court erred by determining that appellant is subject to the predatory-offender registration requirement.[1] We affirm.

**FACTS**

In or around March 2013, appellant Livinus Ndubisi Ezeobi and L.F. began a cohabiting romantic relationship. At that time, L.F. had a young child by another man and was pregnant with Ezeobi's child. In October 2013, police arrested L.F. and cited her for misdemeanor domestic assault of Ezeobi. The district court consequently issued a domestic-assault no-contact order (DANCO) that prohibited L.F. from having any contact with Ezeobi. But L.F. continued to live with Ezeobi. In December 2013, police arrested L.F. for violating the DANCO. L.F. nevertheless continued to live with Ezeobi.

In February 2014, Ezeobi allegedly struck L.F., choked her, threatened her with a knife, and sexually assaulted her. L.F. reported the alleged crimes to police, resulting in her arrest for violating the DANCO. Respondent State of Minnesota charged Ezeobi with first-degree criminal sexual conduct, third-degree criminal sexual conduct, second-degree assault with a dangerous weapon, terroristic threats, domestic assault by strangulation, and misdemeanor domestic assault. Before Ezeobi's jury trial, the district court ruled that the

---

[1] Appellant also appears to challenge unadjudicated guilty verdicts on charges of domestic assault by strangulation and misdemeanor domestic assault. We do not separately address this challenge. *See State v. Hoelzel*, 639 N.W.2d 605, 609 (Minn. 2002) (concluding that district court's finding of guilt was not appealable in absence of official judgment of conviction or conviction order entered by court); *cf. State v. Ashland*, 287 N.W.2d 649, 650 (Minn. 1979) (declining to address sufficiency of evidence for jury's guilty verdict on offenses of which defendant was not formally adjudicated guilty and for which defendant was not sentenced).

state could introduce expert testimony "explaining victim behaviors in domestic violence situations." At trial, Scott Miller provided expert testimony on battering, L.F. testified, and Ezeobi testified in his own defense. The jury found Ezeobi guilty of terroristic threats, domestic assault by strangulation, and misdemeanor domestic assault; it found Ezeobi not guilty of first-degree criminal sexual conduct, third-degree criminal sexual conduct, and second-degree assault with a dangerous weapon. The court stayed imposition of sentence for terroristic threats, placed Ezeobi on supervised probation for four years, determined that Ezeobi was required to register as a predatory offender, and declined to adjudicate Ezeobi's guilt of domestic assault by strangulation and misdemeanor domestic assault.

This appeal follows.

## D E C I S I O N

*Expert testimony*

Ezeobi argues that the district court abused its discretion by admitting Miller's expert testimony on battering, asserting that L.F. "was not a battered woman" and "exhibited none of the supposedly common behaviors of battered women." Ezeobi claims that the expert testimony incorrectly insinuated that he was a repeat domestic abuser of L.F. We construe Ezeobi's argument as an attack on the relevance of the expert testimony on battering.

"Rulings concerning the admission of expert testimony generally rest within the sound discretion of the district court and will not be reversed absent a clear abuse of discretion." *State v. Mosley*, 853 N.W.2d 789, 798–99 (Minn. 2014), *cert. denied*, 135 S. Ct. 1185 (2015). Likewise, "[r]ulings on the relevancy of evidence are generally left to the

3

sound discretion of the trial court." *State v. Hanks*, 817 N.W.2d 663, 668 (Minn. 2012). "When the admissibility of evidence is challenged on appeal, [appellate courts] defer to the district court's exercise of discretion in the conduct of the trial, and [appellate courts] will not lightly overturn a district court's evidentiary ruling." *Id.* at 667 (quotation omitted). Even if a district court abuses its discretion by admitting expert testimony against a criminal defendant, appellate courts will not reverse "if there is no reasonable possibility that [the testimony] substantially influenced the jury's decision." *See State v. Taylor*, 869 N.W.2d 1, 14 (Minn. 2015) (quotation omitted) (assuming, without deciding, that district court erred by admitting expert testimony and concluding that assumed error was harmless).

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Minn. R. Evid. 702. "Expert testimony is only admissible if the testimony will help the trier of fact in evaluating evidence or resolving factual issues." *State v. Ali*, 855 N.W.2d 235, 251–52 (Minn. 2014) (quotation omitted). "[T]he standard for assessing the helpfulness of proposed expert testimony . . . is an objective standard." *Mosley*, 853 N.W.2d at 800. That is, "[a]n expert opinion is helpful if the members of the jury, having the knowledge and general experience common to every member of the community, would be aided in the consideration of the issues by the offered testimony." *State v. Dao Xiong*, 829 N.W.2d 391, 396 (Minn. 2013) (quotations omitted).

4

"Generally, battered woman syndrome expert testimony may be helpful to juries because battered woman syndrome is beyond the understanding of the average person, and expert testimony may help to explain a phenomenon not within the understanding of an ordinary lay person." *Hanks*, 817 N.W.2d at 667 (quotations omitted). More specifically, "[the supreme court] ha[s] recognized that battered woman syndrome expert testimony is admissible . . . when the State seeks to rehabilitate the credibility of a battered woman in the prosecution of her batterer," *id.*, by "educat[ing] jurors about battered woman syndrome (BWS) and counterintuitive behaviors commonly associated with BWS," *State v. Obeta*, 796 N.W.2d 282, 291 (Minn. 2011). "In determining the relevance of battered woman syndrome evidence, [appellate courts] consider whether the proffered evidence demonstrated that the [parties] had the type of relationship about which the expert will testify." *Hanks*, 817 N.W.2d at 668.

Here, L.F. testified that Ezeobi had assaulted her multiple times and that her own assaults of Ezeobi were defensive or reactive. She also testified that Ezeobi had asked her to kill him with a knife, cut up his own Green Card and blamed it on her, expressed disapproval of L.F.'s desire to spend time with her parents, punished L.F. when she was defiant, damaged electronic devices so that L.F. had "no contact with anything outside," and prevented L.F. from accessing her car keys. On the date of Ezeobi's alleged crimes, L.F. was the mother of an infant and another young child and was pregnant with a third child. She had some degree of financial dependence on Ezeobi and knew that she could be arrested for violating the DANCO.

Ezeobi attacked L.F.'s credibility on the basis of her domestic-assault and DANCO-violation arrests, her lies to her parents and to police, and inconsistencies in her descriptions of events. The attacks on L.F.'s credibility created a need for the state to offer a potential explanation for L.F.'s otherwise counterintuitive or questionable behavior. *See Hanks*, 817 N.W.2d at 667; *Obeta*, 796 N.W.2d at 291. L.F.'s testimony showed her potential vulnerability to battering and depicted a relationship with the battering characteristics that Miller described—one's "attempt to, through use of coercion, violence, [and] threats, . . . dominate" another. On these facts, the district court did not abuse its discretion by admitting Miller's testimony to aid the jury in evaluating evidence and resolving factual issues.

Even if the district court abused its discretion by admitting Miller's testimony, the testimony was limited and harmless. Miller testified only generally about battering, its perpetrators, and its victims. He acknowledged that he knew neither L.F. nor Ezeobi and had no familiarity with the case "other than it's a heterosexual couple in a domestic violence case." Miller did not opine that L.F. had been battered or that Ezeobi was a batterer and acknowledged that men can be battered and women can be batterers. During closing argument, the state referred only briefly to Miller's testimony, stating that it "provided [the jury] a lens to view this evidence through, to view this relationship through, to look at the decisions that [L.F.] made and how those could affect the relationship and her role." And the court instructed the jury that expert "evidence is entitled to neither more nor less consideration by [the jury] than any other evidence." We conclude that any error in the court's admission of the testimony was harmless and warrants no relief because no

6

reasonable possibility exists that Miller's testimony substantially influenced the jury's decision. *See Taylor*, 869 N.W.2d at 14 ("An error is harmless if there is no reasonable possibility that it substantially influenced the jury's decision." (quotation omitted)).

*Sufficiency of the evidence*

Ezeobi argues that the evidence was insufficient to support his conviction of terroristic threats. "When assessing the sufficiency of the evidence, [appellate courts] make a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Vang*, 847 N.W.2d 248, 258 (Minn. 2014) (quotation omitted). "In conducting such a review, [appellate courts] assume that the jury believed the State's witnesses and disbelieved any evidence to the contrary." *State v. Hayes*, 826 N.W.2d 799, 805 (Minn. 2013). "The verdict will not be overturned if, giving due regard to the presumption of innocence and to the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense." *Vang*, 847 N.W.2d at 258 (quotation omitted).

"Whoever threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in a reckless disregard of the risk of causing such terror," is guilty of making terroristic threats. Minn. Stat. § 609.713, subd. 1 (2012). "[P]hysical acts which communicate a threat, as well as oral and written threats, fall within the ambit of [Minn. Stat. § 609.713, subd. 1]." *State v. Murphy*, 545 N.W.2d 909, 916 (Minn. 1996). "[T]he question of whether a given statement is a threat turns on whether the communication in its context would have a reasonable tendency to create apprehension that

its originator will act according to its tenor." *State v. Schweppe*, 306 Minn. 395, 399, 237 N.W.2d 609, 613 (1975) (quotations omitted). "To convict a defendant on a charge of felony terroristic threats, a jury must find that the defendant threatened a specific predicate crime of violence . . . ." *State v. Jorgenson*, 758 N.W.2d 316, 325 (Minn. App. 2008), *review denied* (Minn. Feb. 17, 2009). "[T]he jury must be informed of the elements of that essential predicate offense." *Id.*

In this case, L.F. testified that, after choking her against a wall for approximately 12 seconds, Ezeobi sat on top of her on the floor; grabbed a steak knife; pressed the knife against her chest and moved the knife around for about a minute, leaving visible marks; and told her that he would "stab" her if she moved. The district court instructed the jury that the specific predicate crime of violence for the terroristic-threats offense was second-degree murder, which includes the element of intentionally "caus[ing] the death of a human being." Ezeobi argues that, even if believed, L.F.'s testimony was insufficient to prove that he threatened to intentionally cause the death of a human being. He claims that "[a] threat to stab someone . . . is not so much a threat to kill as it is a threat to injure" and that "[a] threat to injure is not *ipso facto* a threat to kill."

But the question before us is not whether a threat to stab *necessarily* is a threat to kill; the question is whether the jury reasonably could have found that Ezeobi's words and actions constituted a threat to intentionally kill L.F. made either with a purpose to terrorize L.F. or in reckless disregard of the risk of causing such terror. *See* Minn. Stat. § 609.713, subd. 1; *Vang*, 847 N.W.2d at 258; *Murphy*, 545 N.W.2d at 916. According to L.F., Ezeobi physically overpowered her and, with a knife against her chest, told her that he would stab

8

her if she moved. L.F. testified that Ezeobi's conduct caused her to believe that Ezeobi was threatening to kill her. We conclude that L.F.'s testimony and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict of guilt on the charge of terroristic threats.

*Predatory-offender registration*

Ezeobi argues that the district court erred in determining that he is required to register as a predatory offender. Appellate courts review de novo a district court's determination that a person is subject to the predatory-offender registration requirement. *See State v. Lopez*, 778 N.W.2d 700, 705 (Minn. 2010) (reviewing de novo whether defendant was required to register as predatory offender); *State v. Patterson*, 819 N.W.2d 462, 464 (Minn. App. 2012) ("Because resolution of [the issue of whether a defendant was required to register as a predatory offender] is based on interpretation of the offender-registration statute, the district court's implicit determination that [defendant] is required to register as a predatory offender is subject to de novo review."), *review denied* (Minn. Oct. 24, 2012).

A person convicted of an enumerated offense, or of "another offense arising out of the same set of circumstances" as a charged enumerated offense, "shall register" as a predatory offender. Minn. Stat. § 243.166, subd. 1b(a) (Supp. 2013). The registration requirement is triggered by a person's conviction of a non-enumerated offense "arising out of the same set of circumstances" as a charged enumerated offense even if the person was acquitted of the enumerated offense, so long as probable cause existed to support the ultimately unproven charge. *State v. Haukos*, 847 N.W.2d 270, 274–75 (Minn. App. 2014).

9

> The "same set of circumstances" provision in the statute requires registration where the same general group of facts gives rise to both the conviction offense and the charged [enumerated] offense. In other words, the circumstances underlying both must overlap with regard to time, location, persons involved, and basic facts. Although the conviction offense need not be based on identical facts to the charged [enumerated] offense, the facts underlying the two must be sufficiently linked in time, location, people, and events to be considered the "same set of circumstances."

*Lopez*, 778 N.W.2d at 706.

First-degree criminal sexual conduct and third-degree criminal sexual conduct are enumerated offenses under the predatory-offender registration statute. *See* Minn. Stat. § 243.166, subd. 1b(a)(1)(iii). Terroristic threats is not an enumerated offense. *See id.*, subd. 1b(a)(1). Ezeobi therefore is subject to the predatory-offender registration requirement if his conviction of terroristic threats "ar[ose] out of the same set of circumstances," within the meaning of Minn. Stat. § 243.166, subd. 1b(a)(1), as the charges of criminal sexual conduct for which he was tried and acquitted. Ezeobi argues that the terroristic-threats conviction did not arise from the same set of circumstances as the charged sex offenses because the terroristic threat was completed before the alleged sex offense occurred, because the two charges did not share the same characteristics, and because the two offenses did not overlap.

But L.F. testified that Ezeobi sat atop her on the floor, pressed a steak knife against her chest and moved the knife around for about a minute, called her "a whore and a slut and stuff like that," and told her that he would "stab" her if she moved. L.F. testified that she kicked and bit Ezeobi to escape, struggled with him over her car keys, and "was trying

10

to run up the hallway" when "[Ezeobi] grab[bed L.F.] from behind" by her shorts. L.F. testified that she then tripped and fell and that Ezeobi ripped her underwear, got on top of her, and penetrated her vagina with his penis. This testimony showed that the facts underlying the terroristic-threats conviction and the facts underlying the charges of criminal sexual conduct occurred only minutes apart during an unbroken series of violent acts by Ezeobi against L.F. Moreover, the threats of violence underlying the terroristic-threats conviction could have helped Ezeobi to accomplish the alleged sexual assault underlying the charges of criminal sexual conduct. And by calling L.F. sexually derogatory names while threatening to stab her, Ezeobi further entwined the terroristic-threats offense with the criminal sexual conduct that allegedly occurred just moments later.

On these facts, Ezeobi's terroristic-threats conviction "ar[ose] out of the same set of circumstances" as the charges of criminal sexual conduct. *See* Minn. Stat. § 243.166, subd. 1b(a)(1). The district court therefore did not err in determining that Ezeobi is subject to the predatory-offender registration requirement.

*Pro se claims*

In a two-page pro se supplemental brief, Ezeobi states that "[he] ha[s] been . . . accused of a crime [he] know[s] nothing about" and attacks L.F.'s credibility and character. Ezeobi cites neither legal authority nor the appellate record and makes no legally cognizable argument against his conviction or sentence. We therefore do not consider Ezeobi's pro se claims. *See State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008) ("[Appellate courts] will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority.").

**Affirmed.**