*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-1508**

State of Minnesota,
Respondent,

vs.

Cornelius Johnson,
Appellant.

**Filed August 22, 2016**
**Affirmed**
**Halbrooks, Judge**

Stearns County District Court
File No. 73-CR-14-10293

Lori Swanson, Attorney General, Karen B. Andrews, Assistant Attorney General, St. Paul, Minnesota; and

Janelle P. Kendall, Stearns County Attorney, St. Cloud, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Anders J. Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Jesson, Presiding Judge; Halbrooks, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HALBROOKS**, Judge

Appellant argues that the district court abused its discretion by admitting into evidence (1) expert testimony about the behavior of victims in relationships involving

domestic violence and (2) the statement the victim gave to police on the night of the incident. We affirm.

## FACTS

On the evening of November 28, 2014, C.H. was at home with her four children and a few friends. After her children went to bed, C.H. stayed up with her friends until around 1:00 a.m. At 1:00 a.m., she went upstairs to bed and all but one of her friends left. G.C., the friend who stayed, slept downstairs on the sofa. Appellant Cornelius Johnson arrived at C.H.'s home a little after 3:30 a.m. Johnson and C.H. had been in a romantic relationship for a few months when this incident occurred. At the time, there was a domestic-abuse no-contact order (DANCO) in force prohibiting any contact with C.H.

Johnson approached C.H.'s front door and began kicking it. This awoke G.C., who shouted to C.H. that someone was at the door. C.H. came downstairs, told Johnson to stop, and asked him to leave.[1] Instead of leaving, Johnson walked around to the side of the house and began striking the window until it broke.

C.H. called 911 and told the dispatcher that Johnson had kicked in the window and that there was a DANCO in place. She stated that Johnson was "in the window talking to me" and that he was trying to get inside. Johnson fled before the police arrived.

Officer Jeremy Anderson was one of the first officers to reach C.H.'s home. He observed that both panes of the double-paned side window were broken and that there

---

[1] C.H. later testified that she did not want to let Johnson in because she did not want "to be caught" with another male (G.C.) in the house and was afraid that there would be a conflict between Johnson and G.C.

2

were several pieces of shattered glass both inside and outside of the house. The window's screen and blinds were damaged, and picture frames were knocked off of a coffee table located below the window sill.

Officer Anderson interviewed C.H. at the scene.[2] She stated that Johnson "came to [her] house, beating on the doors, kickin' on the doors, and he went to the window and broke it and was talkin' to [her] through the window," "He was crawlin'—almost in the window." C.H. told Officer Anderson that Johnson got upset after he saw G.C. in her home and that Johnson threatened her by saying, "B-tch I'm gonna kill you." Near the end of the interview, C.H. said that she believed that Johnson would have assaulted her if he had entered the home.

The police located Johnson that night and arrested him. The state charged Johnson with one count of first-degree burglary with assault, two counts of terroristic threats, and one count of violation of a DANCO. The state amended the complaint before trial to include two additional counts of attempted first-degree burglary and one count of first-degree burglary of an occupied dwelling, for a total of seven counts.

At trial, C.H. testified that she continued to be in a relationship with Johnson, and she told the jury a different story from the one she had reported to the 911 dispatcher and to Officer Anderson. She testified that Johnson was not angry when he was at the window and that he never tried to get inside her home. She did not recall telling Officer Anderson that Johnson threatened her or that she thought he would assault her if he

---

[2] A recording and transcript of the interview were entered into evidence at trial.

gained access to the home. According to C.H., she said "a lot of things out of anger. I was mad."

The state called Scott Miller, a coordinator at the Domestic Abuse Intervention Project, as an expert witness to provide general testimony about the behavior of victims in relationships involving domestic violence. Without commenting specifically on C.H.'s relationship with Johnson, Miller testified to the characteristics of relationships involving domestic violence and tactics that batterers use to control their victims. He explained what he called "counterintuitive victim behavior" as decisions that victims make that others might not, stating that it is hard to understand for those of us who are not in those circumstances. He testified that "in the vast majority of cases," victims will "change, minimize, or completely deny" their original account of what occurred during an incident involving domestic violence. He also stated that victims often remain in relationships even after being abused.

The jury found Johnson not guilty of two counts of first-degree burglary and one count of terroristic threats but guilty of two counts of attempted first-degree burglary, one count of terroristic threats, and one count of violation of a DANCO. The district court sentenced Johnson to 57 months for his conviction of attempted first-degree burglary with assault and did not sentence him for the other convictions, finding that they arose out of the same behavioral incident. This appeal follows.

4

**D E C I S I O N**

**I.**

Johnson argues that the district court erred by admitting Miller's expert testimony explaining common victim behavior in relationships involving domestic violence because the state did not establish that expert testimony would be relevant or helpful to the jury. "The admission of expert testimony is within the broad discretion accorded a [district] court, and rulings regarding materiality, foundation, remoteness, relevancy, or the cumulative nature of the evidence may be reversed only if the [district] court clearly abused its discretion." *State v. Ritt*, 599 N.W.2d 802, 810 (Minn. 1999) (quotation and citation omitted). But even if the district court abused its discretion, we will not reverse and remand the case unless the party asserting the argument demonstrates that it was prejudiced by the error. *State v. Davis*, 820 N.W.2d 525, 536 (Minn. 2012).

For expert testimony pertaining to the behavior of victims in relationships involving domestic violence to be admissible, it must be helpful to the trier of fact, its prejudicial effect must not substantially outweigh its probative value, and it must be relevant. *State v. Grecinger*, 569 N.W.2d 189, 193 (Minn. 1997). Such expert testimony is helpful to the trier of fact to shed light on why a victim would recant a prior statement and why a victim would remain in an abusive relationship. *Id.* at 195; *State v. Vance*, 685 N.W.2d 713, 719 (Minn. App. 2004), *review denied* (Minn. Nov. 23, 2004).

To avoid unfair prejudice, the expert cannot testify as to whether the victim was in a relationship involving domestic violence or that the victim actually exhibited the behaviors the expert describes. *See Grecinger*, 569 N.W.2d at 197 (declaring that an

5

expert on battered women's syndrome cannot testify that the victim suffers from the syndrome). Instead, the expert can give a definition of a relationship that involves domestic violence and/or an explanation of the common characteristics of such a relationship. *Id.* The expert can then testify about the effects the relationship can have on victims. *Id.*

For evidence to be relevant, it must "hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. To determine whether expert testimony explaining victim behaviors in relationships involving domestic violence is relevant, we must consider whether the state offered sufficient evidence to demonstrate that Johnson and C.H. had the type of relationship the expert defined as one involving domestic violence. *State v. Hanks*, 817 N.W.2d 663, 668 (Minn. 2012).

Here, the state disclosed its intention to call Miller to testify about victim behaviors in domestic-violence relationships. The state intended to use Miller's testimony to help the jury understand C.H.'s seemingly inconsistent behavior, including why she might recant her earlier statement and why she might remain in an abusive relationship. The state indicated that Miller did not know the specifics of this case and would not reach a conclusion that C.H. and Johnson were in a relationship involving domestic violence or that C.H. behaved like a victim in that type of relationship. Miller's trial testimony was consistent with the state's disclosures and limited to detailing the characteristics of a relationship involving domestic violence (including the tactics that the person in control uses) and the behaviors of victims in those relationships.

6

The remaining issue, and the one Johnson focuses his argument on, is whether the testimony was relevant. Before trial, the state provided its expert disclosures to Johnson and the district court. It disclosed Miller's definition of battering and characteristics of relationships involving domestic violence. Miller defined "battering" as "[a]n ongoing patterned use of intimidation, coercion, and violence as well as other tactics of control to establish and maintain a relationship of dominance over an intimate partner." It is Miller's opinion that batterers use tactics such as physical and sexual violence, fear, threats, intimidation, and coercion to control their victims and that the tactics used by batterers can cause victims to recant statements and remain in abusive relationships.

Johnson's attorney objected in a pretrial hearing to the admission of Miller's testimony, stating, "I'm not sure that [the prosecutor] has made the appropriate showing that [the testimony] is appropriate in this case." Specifically, he argued that the state failed to show that Johnson and C.H.'s relationship involved domestic violence as defined by Miller. The district court responded that "nobody knows that at this point." The district court then stated that it needed to hear C.H.'s testimony before ruling on the issue.

By the time the district court ruled, the state had offered sufficient evidence to demonstrate that Johnson and C.H. were in a relationship involving domestic violence. Both C.H. and Officer Anderson had testified. There was evidence that Johnson used physical violence or the threat of violence to control C.H. C.H. told Officer Anderson during the interview on the night of the incident that the police had been called recently because Johnson assaulted her on a separate occasion that resulted in the issuance of a

7

DANCO. C.H. also told Officer Anderson that Johnson threatened to kill her the night he broke her window after he realized that another man was in her home late at night. And C.H. said that based on Johnson's behavior, she feared that he intended to hurt her.

In addition, there was evidence that Johnson tried to coerce C.H. to not involve the police, to drop the charges against him, to not cooperate with the prosecutor, and to change her story (all of which are signs of a relationship involving domestic violence according to Miller). Johnson can be heard in the background of C.H.'s call to 911 pressuring C.H. not to report his conduct to the police.

The state disclosed its intention to introduce jail-house phone calls to an unidentified woman in which Johnson "discusse[d] the victim not appearing for court/dropping the charges."[3] In those calls, Johnson suggested several times that it would help his case if C.H. did not testify or, if she did, she could decline to say that he entered her home in any way. The unidentified woman assured Johnson that she would make sure that C.H. did not appear at trial. Johnson also told the woman that he believed his charges would be reduced if C.H. contacted the prosecutor and verified that his version of the story was correct. After Johnson suggested that C.H. call the prosecutor, the unidentified woman responded, "I'm going to call the prosecuting attorney."

The record supports the state's position that Johnson succeeded in his efforts to coerce C.H. During the interview on the night of the incident, C.H. told Officer Anderson about the threat Johnson made and reported that Johnson crawled in the window. But at trial, C.H. testified that she fabricated a lot of what she told Officer

---

[3] The phone calls were entered into evidence at trial.

Anderson because she was upset. She stated that she did not recall ever telling Officer Anderson that Johnson threatened her or that she felt threatened by him. According to C.H., Johnson never attempted to gain entry to her home through the window. And C.H. testified that she contacted the prosecutor prior to trial to recant parts of her statement.

Johnson urges this court to reverse the district court's evidentiary ruling based on *Hanks*, 817 N.W.2d at 666-67, and *State v. MacLennan*, 702 N.W.2d 219, 235 (Minn. 2005). Both cases are distinguishable. In *Hanks* and *MacLennan*, the supreme court held that the district courts did not abuse their discretion in refusing to admit testimony about relationships involving domestic violence. Further, in both cases, the supreme court held that, where the state had failed to bring forth sufficient facts that showed that the victims were in relationships involving domestic violence, expert testimony regarding those types of relationships would not have been relevant. *Hanks*, 817 N.W.2d at 669; *MacLennan*, 702 N.W.2d at 235.

Here, the state produced sufficient facts to establish that C.H. and Johnson were in a relationship involving domestic violence. And the state demonstrated that Miller's testimony was relevant, would be helpful to the jury, and that its prejudicial effect did not substantially outweigh its probative value. We therefore conclude that the district court properly exercised its discretion by admitting into evidence the expert testimony describing the general behavior of victims in relationships involving domestic violence.

**II.**

Johnson argues that the district court erred by admitting C.H.'s statements made during the interview with Officer Anderson under the excited-utterance exception to the

rule against hearsay. "We review [the] district court's evidentiary rulings for an abuse of discretion." *Davis*, 820 N.W.2d at 536.

Generally, hearsay is not admissible at trial unless an exception to the rule against hearsay applies. Minn. R. Evid. 802. The excited-utterance exception to the rule against hearsay allows for the admission of hearsay if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Minn. R. Evid. 803(2). "The rationale for this exception stems from the belief that the excitement caused by the event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement." *State v. Bauer*, 598 N.W.2d 352, 366 (Minn. 1999) (quotation omitted). "While there are no strict temporal guidelines for admitting an excited utterance, the statement must be made while the declarant is under the stress of excitement from the startling event." *Davis*, 820 N.W.2d at 536 (quotation omitted). The relevant factors used to determine if a "statement qualifies as an excited utterance include the length of time elapsed, the nature of the event, the physical condition of the declarant, and any possible motive to falsify." *State v. Hogetvedt*, 623 N.W.2d 909, 913 (Minn. App. 2001) (quotation omitted), *review denied* (Minn. May 29, 2001).

Here, the parties do not dispute that C.H.'s statements related to a startling event. But Johnson argues that the state failed to establish that C.H. continued to be under the stress of excitement caused by the event when she made the statements because Officer Anderson testified that he gave C.H., who was extremely emotional, a moment to calm down. We disagree.

10

C.H. called 911 at 3:58 a.m., immediately after Johnson broke the window. While the record does not reveal when Officer Anderson arrived at C.H.'s home, the record establishes that he interviewed C.H. at 4:18 a.m. Officer Anderson testified that he "could tell she had been crying. She was visibly upset, a little shaken, probably a little angry," so he gave her a moment to calm down. He explained that he did so because, in his experience, if a person is "hysterical you can't hardly get any information out of them."

Based on the short amount of time between when the event occurred and when C.H. gave her statement, combined with the nature of the event and Officer Anderson's observations of her, the district court properly concluded that C.H. was still under the stress of the event when she made the statement and that she lacked an opportunity for reflection or conscious fabrication. The district court acted within its discretion by admitting C.H.'s statements to Officer Anderson under the excited-utterance exception to the rule against hearsay.

**Affirmed.**